695 A.2d 132

**Michael Patron HUGHES**

v.

**STATE of Maryland.**

**No. 60, Sept.Term, 1996.**

Court of Appeals of Maryland.

June 17, 1997.

82

Richard K. Jacobsen, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER JJ.

CHASANOW, Judge.

We are called upon in this case to examine the validity and scope of what is commonly known as the "routine booking question" exception to the requirements of *Miranda v. Ari-*

zona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The precise issue before the Court is whether the "routine booking question" exception encompasses a question on an arrest intake form as to whether the arrestee is a "narcotics or drug user." For the reasons set forth below, we conclude that it does not. Accordingly, the admission of testimony regarding the arrestee's response, absent *Miranda* warnings, to this question was error and requires reversal of the judgment below.

## I.

The petitioner, Michael Patron Hughes, was arrested on October 14, 1993, for his suspected involvement in the distribution of illegal drugs. He was subsequently charged with possession with intent to distribute cocaine, possession of cocaine, conspiracy to distribute cocaine and conspiracy to possess with intent to distribute cocaine. The petitioner was tried by jury in the Circuit Court for Prince George's County, which resulted in a verdict of guilty on all charges.

At trial, Corporal David Morrissette of the Prince George's County Police Department described the events leading up to the petitioner's arrest. He testified that the petitioner was arrested in connection with a narcotics distribution surveillance operation on Warner Avenue in Landover Hills. The operation consisted of two plain-clothed police officers, who scanned the area for illegal drug activity, and approximately 15 uniformed officers, who stood by to apprehend offenders if any such activity were observed.

Upon receiving a radio communication from the surveillance officers that they had indeed witnessed a series of apparent drug transactions, Corporal Morrissette and other uniformed officers proceeded to the target location. As the officers approached, a group of three to four individuals, one of whom was the petitioner, dispersed and fled the area. Corporal Morrissette pursued and ultimately apprehended the petitioner. During the course of the pursuit, the petitioner discarded an item, which later was determined to be a glassine bag

containing approximately eight rocks of crack cocaine. Corporal Morrissette also discovered in the petitioner's possession a pager and $62.00 in mostly small bills.

During post-arrest processing, Corporal Morrissette completed a standard Prince George's County Police Department arrest report. In addition to such biographical information as the arrestee's name, address, and telephone number, the arrest form contains a section in which the officer is to indicate whether the arrestee is a "narcotic or drug user." If the arrestee answers this question in the affirmative, the officer is to indicate the "type" of narcotic or drug. The petitioner, however, answered this question in the negative.

At trial, the prosecutor sought to have Corporal Morrissette testify as to the petitioner's negative response to the "narcotics or drug" use question. Defense counsel objected on the ground that the petitioner had not yet been advised of his *Miranda* rights at that time, and that the response to the question was thus inadmissible. The prosecutor countered that the question was exempt from *Miranda* under the routine booking question exception. After much discussion, the trial judge permitted the following testimony:

"[STATE'S ATTORNEY]: Corporal Morrissette, I'm showing you what has been marked as State's Exhibit No. 4, and what is that document, just for the record?

[MORRISSETTE]: Prince George's County Police Department arrest report.

[STATE'S ATTORNEY]: And who filled that document out?

[MORRISSETTE]: I did.

[STATE'S ATTORNEY]: And on Question No. 18, which is part of the preprinted booking information, did you ask the defendant whether or not he was a narcotics or drug user?

[MORRISSETTE]: Yes.

[STATE'S ATTORNEY]: And what was his response?

[MORRISSETTE]: No, he was not."

The prosecutor later used the petitioner's response that he was not a drug user to support the charge that the petitioner intended to distribute, as opposed to consume, the cocaine in his possession. In closing argument, the prosecutor urged the jury to consider the significance of the defendant's response as follows:

"You also have a statement that was made during the booking process by the defendant that he doesn't use drugs. Well, you may consider that however you wish. You can ignore it totally if you want to, whatever you want to do, but I think that that is—you can take that into consideration. If he says he doesn't use drugs, then he presumptively didn't have this for his own personal use, he intended to do something with it, or if you decide that because he was being booked at that time that maybe he wasn't telling the whole story, that's fine, but even without that statement, you certainly have a quantity of drugs with the surrounding circumstances that indicate that he in fact intended to sell it or give it away."

On appeal of his convictions to the Court of Special Appeals, the petitioner asserted that the trial court erred in permitting Officer Morrissette to testify regarding the negative response to the drug use question on the arrest intake form.[1] The intermediate appellate court held that the question fell within the routine booking question exception to *Miranda,* and it found no error by the trial judge in admitting the testimony.

## II.

### A.

■ In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court concluded that proper protection of the privilege against self-incrimination requires

---

1. The petitioner also argued that there was insufficient evidence to support the convictions for conspiracy to distribute cocaine and conspiracy to possess with intent to distribute cocaine. The Court of Special Appeals rejected that argument, and the issue is not now before this Court.

the adoption of certain procedural safeguards in the context of custodial interrogation. Specifically, the Court held that an individual in police custody must be warned, prior to any interrogation, "that he has the right to remain silent, that anything he says can be used against him in a court of law, [and] that he has the right to the presence of an attorney," either retained or appointed. *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. Absent a knowing and voluntary waiver of these rights, any incriminating responses to police questioning are inadmissible against the detained individual at subsequent criminal proceedings. *Id.*

■ The obligation to give *Miranda* warnings arises whenever an individual is subjected to "custodial interrogation." *See Vines v. State,* 285 Md. 369, 374, 402 A.2d 900, 903 (1979)(observing that "in order to be subject to the *Miranda* warnings, statements must flow from a 'custodial interrogation' within the meaning of *Miranda* "). In the years since this landmark decision, however, a number of exceptions to *Miranda*'s requirements have been recognized. *See, e.g., New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)(public safety exception).

One such exception to *Miranda*'s requirements is referenced by the Supreme Court in *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). It is known as the routine booking question exception. At issue in *Muniz* was a series of questions posed, without *Miranda* warnings, to one Inocencio Muniz who was arrested on suspicion of driving while intoxicated. *Muniz,* 496 U.S. at 585, 110 S.Ct. at 2642, 110 L.Ed.2d at 541. In accordance with standard police procedure, the arresting officer asked Muniz his name, address, height, weight, eye color, age, and date of birth. The officer also asked Muniz if he knew the date of his sixth birthday, to which Muniz responded that he did not. *Muniz,* 496 U.S. at 586, 110 S.Ct. at 2642, 110 L.Ed.2d at 542. The responses to these questions were captured on a video tape, which was later admitted into evidence at trial. *Muniz,* 496 U.S. at 585–87, 110 S.Ct. at 2642, 110 L.Ed.2d at 541–42. On

appeal of his conviction, Muniz asserted, among other things, that admission of the video tape violated *Miranda* and the privilege against self-incrimination.

The Supreme Court agreed that the question concerning the date of the suspect's sixth birthday should have been suppressed because of its incriminating content. *Muniz*, 496 U.S. at 600, 110 S.Ct. at 2649, 110 L.Ed.2d at 551. The Court explained that "[t]he content of his truthful answer supported an inference that his mental faculties were impaired" because "the trier of fact might reasonably have expected a lucid person to [be able to] provide" that date. *Muniz*, 496 U.S. at 599, 110 S.Ct. at 2649, 110 L.Ed.2d at 550. The suspect's response to that question, therefore, should have been suppressed.

More importantly for our purposes in the instant case, a plurality of the *Muniz* Court further agreed that responses to the first seven questions (*i.e.*, name, address, height, weight, eye color, age, and date of birth) fell within a "routine booking question" exception to *Miranda*. This exception "exempts from Miranda's coverage questions to secure the ' "biographical data necessary to complete booking or pretrial services." ' " *Muniz*, 496 U.S. at 601, 110 S.Ct. at 2650, 110 L.Ed.2d at 552 (quoting Brief for U.S. as *Amicus Curiae* at 12, in turn quoting *United States v. Horton*, 873 F.2d 180, 181 n. 2 (8th Cir.1989)). As the Court explained:

"The state court found that the first seven questions were 'requested for record-keeping purposes only,' . . . and therefore the questions appear reasonably related to the police's administrative concerns. *In this context,* therefore, the first seven questions asked at the Booking Center fall outside the protections of *Miranda* and the answers thereto need not be suppressed." (Footnote omitted)(emphasis added).

*Muniz*, 496 U.S. at 601–02, 110 S.Ct. at 2650, 110 L.Ed.2d at 552. The Supreme Court emphasized, however, that not every question asked during the booking process necessarily falls within the routine booking question exception. *See Muniz*, 496 U.S. at 602 n. 14, 110 S.Ct. at 2650 n. 14, 110 L.Ed.2d

at 552 n. 14. Quoting with approval an excerpt from an *amicus* brief, the Court stated:

" 'Recognizing a "booking exception" to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, *that are designed to elicit incriminating admissions.*' " (Emphasis added).

*Id.* (quoting Brief for U.S. as *Amicus Curiae* at 13). The *Muniz* decision thus suggests that routine booking questions regarding the arrestee's name, address, height, weight, eye color, date of birth, and current age, which are aimed at securing "biographical data necessary to complete booking or pretrial services," and which are asked in that context are exempt from the requirements of *Miranda,* unless they are "designed to elicit incriminating admissions."

Only four Justices joined in the portion of the *Muniz* opinion, however, that carved out this exception to *Miranda.* In a dissenting opinion, Justice Marshall criticized the plurality's recognition of the routine booking question exception, stating that "[e]ven if a routine booking question exception to *Miranda* were warranted, that exception should not extend to any booking question that the police should know is reasonably likely to elicit an incriminating response, *regardless of whether the question is 'designed' to elicit an incriminating response....*" *See Muniz,* 496 U.S. at 610–11, 110 S.Ct. at 2655, 110 L.Ed.2d at 558 (Marshall, J., dissenting) (citation omitted)(emphasis added). Justice Marshall further explained: "Although the police's intent to obtain an incriminating response is relevant to [the] inquiry, the key components of the analysis are the nature of the questioning, the attendant circumstances, and the perceptions of the suspect. Accordingly, *Miranda* warnings are required before the police may engage in any questioning reasonably likely to elicit an incriminating response." *Id.* (citation omitted). The remaining four Justices found it "unnecessary" to examine the applicability of the booking question exception defined by the plurality because, in their view, "Muniz's responses to the videotaped

'booking' questions were not testimonial and do not warrant application of the [Fifth Amendment] privilege." *Muniz,* 496 U.S. at 608, 110 S.Ct. at 2654, 110 L.Ed.2d at 556 (Rehnquist, C. J., concurring in the result). Hence, while the *Muniz* decision indicates that some members of the Supreme Court supported a routine booking question exception, the opinion does not reflect a consensus of the Court as to the scope of that exception.

## B.

Prior to the *Muniz* decision, a routine booking question exception to *Miranda* had gained widespread acceptance among lower courts. *See, e.g., U.S. v. Doe,* 878 F.2d 1546 (1st Cir.1989); *United States v. Morrow,* 731 F.2d 233 (4th Cir.), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984); *United States v. Avery,* 717 F.2d 1020 (6th Cir.1983), *cert. denied,* 466 U.S. 905, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984); *United States v. McLaughlin,* 777 F.2d 388 (8th Cir.1985); *United States v. Disla,* 805 F.2d 1340 (9th Cir. 1986); *United States v. Glen–Archila,* 677 F.2d 809 (11th Cir.), *cert. denied,* 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 137 (1982). The justification for the exception was that an arrestee is not subjected to the coercive atmosphere of custodial interrogation that *Miranda* was intended to prevent when he or she is asked a question that is not intended to elicit an incriminating response. *See Mills v. State,* 278 Md. 262, 268, 363 A.2d 491, 494 (1976)(and cases cited therein); *see also Com. v. Kacavich,* 28 Mass.App.Ct. 941, 550 N.E.2d 397, 397 (1990)(stating that "routine booking inquiries ... are not interrogation within the meaning of the *Miranda* rule"). That is to say, because booking questions generally are not designed to evoke incriminating answers, courts reasoned that they do not rise to the level of "interrogation," as contemplated by the Supreme Court in *Miranda.* In Maryland, the Court of Special Appeals has applied this reasoning to uphold the validity of questions regarding a suspect's name, address, and place of employment. *See Clarke v. State,* 3 Md.App. 447, 451, 240 A.2d 291, 294 (1968)(stating that these questions

"were not intended to elicit answers which would incriminate the Appellant"); *Propst, May & May v. State,* 5 Md.App. 36, 43, 245 A.2d 88, 92 (1968)(upholding validity of question about address and stating that "we do not think that routine booking procedures are the kind of interrogation covered by *Miranda* in the absence of unusual circumstances...."); *Grimes v. State,* 44 Md.App. 580, 586, 409 A.2d 767, 771 (1980)(relying on *Clarke* and *Propst* to uphold question about name), *rev'd on other grounds,* 290 Md. 236, 429 A.2d 228 (1981); *Ferrell v. State,* 73 Md.App. 627, 640, 536 A.2d 99, 105 (1988)(relying on *Grimes* and stating that "routine questions seeking a person's name and address are not proscribed by *Miranda....*"), *rev'd on other grounds,* 318 Md. 235, 567 A.2d 937 (1990).

The Supreme Court's decision in 1980 in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), however, prompted a subtle change in the application of the booking question exception. In *Innis,* the Supreme Court held that "interrogation" for purposes of *Miranda* is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are *reasonably likely to elicit an incriminating response* from the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308 (emphasis added)(footnote omitted). The notion that a question "normally attendant to arrest and custody" may also be "reasonably likely to elicit an incriminating response" appears not to have been contemplated by the *Innis* Court. Lower courts, nevertheless, have interpreted *Innis* to mean that the routine booking question exception does not apply if a police officer knows, or should know, that a routine booking question, although innocuous on its face, is reasonably likely to evoke an incriminating answer. *See, e.g., Disla,* 805 F.2d at 1347 (stating that the "officer ... should have known that the question regarding [the suspect's] residence was reasonably likely to elicit an incriminating response" and "[i]n light of both the context of the questioning and the content of the question ... Disla was subjected to interrogation"); *United States v. Mata–Abundiz,* 717 F.2d 1277, 1280 (9th Cir.1983)(stating that "[i]f ... the questions

are reasonably likely to elicit an incriminating response in a particular situation, the exception does not apply"). Under this standard, courts have held that *Miranda* warnings should have preceded questions concerning such topics as an arrestee's citizenship, *see Mata–Abundiz,* 717 F.2d at 1280 and *Doe,* 878 F.2d at 1551; residence, *see Disla,* 805 F.2d at 1347 (but failure to suppress held to be harmless error); and name, *see U.S. v. Parra,* 2 F.3d 1058, 1068 (10th Cir.)(but failure to suppress held to be harmless error), *cert. denied,* 510 U.S. 1026, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993). *But see U.S. v. Broadus,* 7 F.3d 460, 464 (6th Cir.1993)(no indication that police should have known that routine question about telephone number was likely to elicit incriminating information); *People v. Rodney,* 85 N.Y.2d 289, 624 N.Y.S.2d 95, 98, 648 N.E.2d 471, 474 (1995)(question about occupation not reasonably likely to elicit an incriminating response).

### C.

Interestingly, the *Muniz* plurality did not acknowledge, in its discussion of the routine booking question exception, the limitation derived from *Innis* that lower courts had adopted. The standard set forth by the plurality, rather, was that questions asked during booking that are aimed at gathering biographical information for record-keeping purposes are exempt from *Miranda;* the express limitation on this rule is that the police may not ask questions, under the guise of routine booking questions, that are "designed to elicit incriminating admissions."[2] The *Innis*-based formulation, in contrast, recognizes an exemption for routine booking questions, but pro-

---

**2.** The plurality expressly rejected the test suggested by the State, however, that questions that are "not intended to elicit information for investigatory purposes" do not constitute "interrogation" under *Innis.* The Court explained: "[T]he *Innis* test focuses primarily upon 'the perspective of the suspect.'" *Pennsylvania v. Muniz,* 496 U.S. 582, 601, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528, 552 (1990)(quoting *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243, 251 (1990)). This explanation appears to be merely a comment upon the proper formulation of the *Innis* test, rather than a tacit approval of the *Innis*-based formulations of the routine booking question exception.

hibits police from posing, absent *Miranda* warnings, any questions that the police know or should know are "reasonably likely to elicit an incriminating response." The difference between the two standards is that the former limits the scope of the booking question exception based solely on the actual intent of the police officer in posing the question, while the latter restricts the exception based on an objective assessment of the likelihood, in light of both the context of the questioning and the content of the question, that the question will elicit an incriminating response.

The distinction between the two standards has gone largely unremarked upon in post-*Muniz* discussions of the routine booking question exception. *See, e.g.,* DAVID M. NISSMAN AND ED HAGEN, LAW OF CONFESSIONS § 5.13 at 5–22 (2d ed.1994)(stating, without qualification, that "[t]he [routine booking question] exception was formally adopted by the United States Supreme Court in *Pennsylvania v[.] Muniz* "); WAYNE R. LaFAVE AND JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 6.7 at 327 (2d ed.1992)(stating that *Muniz* supports lower court decisions, based on the definition of interrogation in *Innis*, that routine booking questions do not require *Miranda* warnings, but offering no discussion of the limits of the exception); *see also Broadus*, 7 F.3d at 460 (*Muniz* not mentioned in decision). Some courts, in fact, have defined the routine booking question exception in the language of *Muniz*, but have then employed the *Innis*-based standard as if the two formulations were interchangeable. For example, in *Parra, supra,* the court wrote:

> "[W]here questions regarding normally routine biographical information are *designed to elicit incriminating information,* the questioning constitutes interrogation subject to the strictures of *Miranda.* In this case, [the law enforcement officer] did not question [the suspect] to obtain general booking information. Rather, he questioned [the suspect] about his true name for the direct and admitted purpose of linking [the suspect] to his incriminating immigration file. Under these circumstances, the questioning was *reasonably likely to elicit incriminating information* relevant to estab-

lishing an essential element necessary for a conviction...."
(Citation omitted)(emphasis added).
2 F.3d at 1068. Similarly disregarding the distinction, the
court in *People v. Rodney, supra,* cited *Muniz* in support of
the statement that the routine booking question exception
does not apply "if the questions, though facially appropriate,
are *likely* to elicit incriminating admissions...." 624
N.Y.S.2d at 98, 648 N.E.2d at 474 (emphasis added). Contrib-
uting to the lack of attention given the slight, but significant,
difference in tests may be the fact that the *Muniz* plurality
did not expressly reject the *Innis*-based decisions, and may
also be the perception that the two approaches are not neces-
sarily irreconcilable. The Fourth Circuit Court of Appeals,
for example, has referred to courts that use the *Innis*-based
formulation as merely "elaborat[ing] upon the booking [ques-
tion] exception" as defined in *Muniz. U.S. v. D'Anjou,* 16
F.3d 604, 608 (4th Cir.1994). In its review of the instant case,
however, the Court of Special Appeals seemed to reject the
*Innis*-based test · and instead concluded that the principle
"established" by *Muniz* was that "the booking exception ap-
plies to routine questions ... unless they are *asked for the
purpose* of obtaining incriminating answers." (Emphasis add-
ed). Using this formulation of the routine booking question
exception, the intermediate appellate court held the question
was within the routine booking exception. We disagree.

### III.

█ We agree that certain routine questions asked during
the booking process are ordinarily exempt from the require-
ments of *Miranda. See State v. Conover,* 312 Md. 33, 39, 537
A.2d 1167, 1170 (1988)(stating that " '[t]here seems to be
general agreement ... that *Miranda* does not apply to "ad-
ministrative questioning," the routine questions asked of all
arrestees who are "booked" or otherwise processed' ")(quoting
*Vines,* 285 Md. at 376, 402 A.2d at 904). In order for this
exception to apply, however, the questions must be directed
toward securing "simple identification information of the most
basic sort;" that is to say, only questions aimed at accumulat-
ing "basic identifying data required for booking and arraign-

ment" fall within this exception. *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1113 & n. 2. (2d Cir.1975), *cert. denied sub nom., Hines v. Bombard,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). Examples of questions to which the routine booking question exception will ordinarily extend include the suspect's name, address, telephone number, age, date of birth, and similar such pedigree information.

Conversely, questions that are "designed to elicit incriminatory admissions" do not fall within the narrow routine booking question exception. *Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. at 2650 n. 14, 110 L.Ed.2d at 552 n. 14. In some instances, it is plain from the nature of the question whether it is aimed at merely gathering pedigree information for record-keeping purposes, or whether it is directed at procuring statements by the suspect that, either in isolation or in connection with other known facts, will tend to prove the suspect's guilt. The question in *Muniz* regarding the date of the suspect's sixth birthday falls within the latter category, as does inquiry into such obviously incriminating areas as whether or why a suspect committed a criminal act.

Even if a question appears innocuous on its face, however, it may be beyond the scope of the routine booking question exception if the officer knows or should know that the question is reasonably likely to elicit an incriminating response. Assessment of the likelihood that an otherwise routine question will evoke an incriminating response requires consideration of the totality of the circumstances in each case, with consideration given to the context in which the question is asked. The fact that the *answer* to a booking question assists the prosecution in proving its case is not determinative of whether a standard booking *question,* when posed, was *likely* to elicit an incriminating response. A benign question in one case may amount to "interrogation," for which *Miranda* warnings are required, in another case. Therefore, "courts should carefully scrutinize the factual setting of each encounter of this type," *Avery,* 717 F.2d at 1025, keeping in mind that the critical inquiry is whether the police officer, based on the totality of the circumstances, knew or should have known that

the question was reasonably likely to elicit an incriminating response. *Avery,* 717 F.2d at 1024; *see also Parra,* 2 F.3d at 1068 (finding immigration agent's question as to suspect's identity was "interrogation" for purposes of *Miranda* in that it linked suspect to incriminating immigration file, but concluding that the error was harmless).

We also note that where a purportedly routine booking question provides some proof of an element of the crime for which the suspect is arrested, the booking question exception will be less likely to apply. Stated otherwise, "[t]he closer the connection between the crime in question and the information sought, the stronger the inference that the [police officer] should have known that [the] inquiry was 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Minkowitz,* 889 F.Supp. 624, 628 (E.D.N.Y.1995)(quoting *Muniz,* 496 U.S. at 601, 110 S.Ct. at 2650, 110 L.Ed.2d at 551). For example, in *United States v. Disla, supra,* the Ninth Circuit Court of Appeals held that the questioning as to the defendant's residence amounted to interrogation for purposes of *Miranda* where the police officer knew that drugs earlier had been found at a particular address and where the inquiry was made at the scene of the arrest, not in a routine booking setting. The court explained:

"The facts here indicate that officer Zamora should have known that the question regarding Disla's residence was reasonably likely to elicit an incriminating response. Zamora knew that a large quantity of cocaine and cash had been found at the Anita Street apartment and that the resident(s) of the apartment had not been identified. After the cocaine and cash were discovered, Zamora asked neighbors for a description of the persons who lived at the apartment and observed Disla and his brother approach the apartment building. * * * [T]he question as to where Disla lived was related to an element (possession) of the crime that Zamora had reason to suspect Disla committed."

*Disla,* 805 F.2d at 1347.

In *United States v. Doe, supra,* the court reached a similar conclusion with regard to a query as to the appellants'

citizenship. After being rescued by the Coast Guard from a burning ship, the appellants in *Doe* were handcuffed and chained to the deck of the Coast Guard vessel. *Doe*, 878 F.2d at 1550. A Coast Guard officer then asked each appellant his or her name and citizenship; each individual responded that he or she was an American citizen. *Id.* Although a question about citizenship may be a permissible booking question in some contexts, the circumstances in that case were such that the exception did not apply. The appellants were convicted under a statute that "makes it a crime 'for *a citizen of the United States* on board *any* vessel' to possess drugs with [the] intent to distribute them." *Id.* (quoting 21 U.S.C. § 955a(b)(1980)(emphasis in *Doe* )). The court thus concluded:

> "[Q]uestions about citizenship, asked on the high seas, of a person present on a *foreign* vessel with drugs aboard, would (in our view) seem 'reasonably likely to elicit an incriminating response.' *United States v. Mata–Abundiz*, [717 F.2d 1277 (9th Cir.1983) ]. When, or whether, the United States can prosecute a person found on such a ship is not immediately obvious; and the possibility that prosecution will turn upon citizenship is great enough ... that Coast Guard officers ought to know that answers to such questions may incriminate." (Emphasis in original).

*Doe*, 878 F.2d at 1551–52. The location of the questioning, along with the nature of the crime of which the arrestee is suspected, therefore, has some bearing on whether a particular question constitutes interrogation, for which *Miranda* warnings are a prerequisite.

## IV.

■■■ Applying the above principles to the instant case, we conclude that the question as to the petitioner's "narcotics or drug use" does not fall within the routine booking question exception to *Miranda*. The State argues that the question qualifies as a routine booking question because it is contained on a standard booking form; it is asked of every arrestee, regardless of the charge; and it is asked for reasons "wholly apart from investigating crime."

The State's argument is flawed in several respects. First, the mere fact that a question is asked during booking does not mean that it necessarily falls within the booking question exception. The police may not use the booking process as a pretext for gathering incriminating information. *Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. at 2650 n. 14, 110 L.Ed.2d at 552 n. 14; *see United States v. Hinckley,* 672 F.2d 115, 125 (D.C.Cir.1982)("Thus, where the mental state of an arrestee looms as a likely issue, we can only conclude that a systematic, 25–minute 'background' interview was designed to elicit 'incriminating' responses. . . . "). Therefore, the inclusion of this question on a standard booking form is not necessarily determinative. We noticed that the Prince George's County Police Department arrest report also contains an area in which the officer is to list the names of any "accomplices" in the suspected criminal activity. Surely, the State would not argue that inquiring as to a suspect's confederates in crime amounts to a routine booking question, yet this question is nevertheless included on the arrest report.

In addition, as explained in section III above, a seemingly benign question may be reasonably likely to evoke a self-incriminating response in certain circumstances. Hence, that the drug use question is asked of every arrestee is similarly not dispositive. The totality of the circumstances determines whether a question is reasonably likely to elicit an incriminating response. Where an individual is arrested on drug charges, as was the petitioner, most questions about drug use seem particularly likely to call for an incriminating response. *See Nasiriddin v. State,* 16 Md.App. 479, 500–01, 298 A.2d 490, 502–03 (*Miranda* precluded question as to whether suspect had a drug problem where officer knew that drug paraphernalia had been found in suspect's vehicle), *cert. denied,* 414 U.S. 1028, 94 S.Ct. 458, 38 L.Ed.2d 321 (1973). In the instant case, Officer Morrissette knew that the petitioner had been arrested in connection with a narcotics distribution surveillance operation. The petitioner's negative response to the drug use question was thus inculpatory in that it supported the charge that he intended to distribute, as opposed to consume, the

cocaine. Answering the question in the affirmative, however, would have amounted to an admission that he engages in criminal behavior. Regardless of the officer's intent in asking the question, therefore, the question was more than reasonably likely to evoke an incriminating response; it was almost certain to do so.

The State also asserts that the question is a valid means of redressing certain administrative concerns; namely, that (1) knowledge of the potential of illness or violence resulting from drug withdrawal will enable the police to provide necessary medical treatment to the suspect, and to protect others from harm; and that (2) the information is helpful because the fact that a suspect is under the influence of drugs may affect the voluntariness of any confession procured. The intermediate appellate court agreed that the drug use question is "relevant to whether an arrestee might need medical services." There is nothing in the record to suggest, however, that the petitioner might have been under the influence of "narcotics or drugs" or that he otherwise might have been in need of medical services.

Furthermore, if the police department is concerned about violence or illness resulting from drug use or other such concerns, the appropriate question would appear to be whether the suspect is *currently under the influence of* any narcotics or drugs, as opposed to whether the suspect is generally a narcotics or drug user. It would also seem advisable to inquire as to whether the suspect is taking any prescription medication that might similarly affect the well-being of the suspect or those around him, rather than restrict the inquiry to narcotics or drugs.

We do not mean to suggest that any particular modification of the question would necessarily fall within the routine booking question exception, but we wish to point out that a question directed toward the present physical state of the suspect seems better-suited to redress the "administrative concerns" cited by the State. Such questions are, moreover, in keeping with the questions at issue in *State v. Geasley,* 85

Ohio App.3d 360, 619 N.E.2d 1086 (1993), the case upon which the Court of Special Appeals relied in concluding that the routine booking question exception applied in the instant case. In *Geasley*, the court held that "asking an arrestee whether he has recently seen a physician, is taking medication, or has any medical condition requiring special treatment is a legitimate police concern when booking a suspect." *Geasley*, 619 N.E.2d at 1093. The court did not address the validity of a question about general narcotics or drug use.

## V.

 In sum, we conclude that certain routine questions asked during the booking process are ordinarily exempt from the requirements of *Miranda*. The routine booking question exception, however, does not encompass questions that are designed to elicit incriminating admissions. In order to determine whether a particular question is designed to, or reasonably likely to, elicit an incriminating response, the court must consider the totality of the circumstances, including the context of the questioning and the content of the question. An incriminating *answer* does not mean an otherwise standard booking *question* was reasonably likely to elicit an incriminating response. The intent of the police officer in posing the question may be relevant to a determination of the applicability of the exception, but it does not control. *Doe*, 878 F.2d at 1551 (observing that "[t]he question is an objective one; the officer's *actual* belief or intent is relevant, but it is not conclusive")(emphasis in original); *Disla*, 805 F.2d at 1347 (stating that "[t]he officer's intent ... is relevant, but not decisive").

Notwithstanding our decision to recognize a routine booking question exception to *Miranda*, we hold that the question at issue in the instant case as to whether the arrestee is a "narcotics or drug user" does not fall within the scope of that exception. Particularly where, as here, an individual is arrested for suspected involvement in the distribution of illegal drugs, this question is reasonably likely to elicit an incriminating response. The petitioner's negative response to the

question thus should have been suppressed, and the trial judge's admission of testimony concerning that answer amounts to error. For these reasons, we reverse the judgment of the intermediate appellate court.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND REMAND THIS CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.*