793 A.2d 567

Dwayne Anthony DRURY,

v.

STATE of Maryland.

No. 23, Sept. Term, 2001.

Court of Appeals of Maryland.

March 8, 2002.

Stacy W. McCormack, Asst. Public Defender (Stephen E. Harris, Public Defender, and Mark Colvin, Asst. Public Defender, on brief), Baltimore, for petitioner.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, Judge.

After Dwayne Anthony Drury, petitioner, was taken into police custody, but before he was advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a police officer showed him physical evidence and told him that the evidence would be processed for fingerprints. The question we must decide in this case is whether, under the circumstances presented herein, the statements that petitioner made prior to being advised of his *Miranda* rights must be suppressed because the officer conducted the functional equivalent of interrogation. We shall answer that question in the affirmative and hold that the statements should have been suppressed.

### I.

Petitioner was indicted by the Grand Jury for Queen Anne's County for the offenses of second degree burglary, fourth degree burglary, and theft over the value of $300.00. Prior to trial, he filed a motion to suppress the statements that he made to the police on the grounds that Corporal Mark Whaley of the Centreville Police Department in Queen Anne's County had interrogated him without informing him of his *Miranda* rights. Petitioner argued that the police officer's conduct was tantamount to interrogation under *Miranda* in that the officer should have known that placing evidence in front of petitioner, and telling him that it would be fingerprinted, was likely to elicit an incriminating response.

The Circuit Court held a hearing on the motion to suppress. The only witness to testify was Corporal Whaley. We recite the facts from the record of the suppression hearing.

On July, 14, 1996, Corporal Whaley went to the Hillside Market in response to a report of a break-in and theft at the market. The owner of the market told Corporal Whaley that he had found a tire iron behind the counter near the cash register. The officer looked around and saw that the rear door of the building had been pried open; it appeared to him that the tire iron had possibly been used to gain entry. Further investigation revealed that some property was missing, including several adult magazines, several cartons of cigarettes, bottles of liquor, and numerous Maryland Instant Scratch–Off Lottery tickets.

Later that evening, a deputy sheriff told Corporal Whaley that he had seen two men acting suspiciously near an alleyway close to the market. Corporal Whaley went to that location, looked through the trash, and found several adult magazines and a liquor bottle. The officer interviewed Karl Kirby, a suspect in the case, who led him to petitioner. Corporal Whaley went to petitioner's home, brought him to the police station, and sat him down "within the department" for questioning. Before advising petitioner of his rights pursuant to *Miranda*, Corporal Whaley placed the tire iron and the trash

bag containing the magazines on a desk in front of petitioner. Petitioner made some statements about the tire iron and the magazines. Corporal Whaley then advised petitioner of his *Miranda* rights, and petitioner made no further statements.

On direct examination, Corporal Whaley testified as follows:

Q: After you talked with Mr. Kirby, did you go visit Mr. Drury?

A: Yes. I picked Mr. Drury up for questioning, at which time I proceeded to show Mr. Drury the evidence which was retrieved. In showing Mr. Drury the tire iron that was retrieved from the actual incident area, Mr. Drury said, well, my fingerprints could be on that and are on hundreds of tire irons around Centreville, okay, and picking up the trash bag in which the magazines were located in, Mr. Drury proceeded to tell me the contents of the bag prior to me even stating what was in the bag myself.

Q: What did he tell you?

A: He said that he had touched the magazines that were in that bag.

On cross-examination, the officer testified as follows:

Q: So you took the evidence out and put it in front of Mr. Drury?

A: I put it up on the desk in front of myself.

\* \* \* \*

Q: And did you tell Mr. Drury that you were going to send this evidence off for fingerprints?

A: As I recall, yes sir.

Q: You told him all that before you Mirandized him?

A: Yes sir.

Q: And that's when you claim that he made some statement about his fingerprints possibly being on these physical items?

A: Yes sir.

Q: And then once he was Mirandized, he didn't want to talk to you?

A: No sir

Petitioner argued that his statements were inadmissible because they were made in custody, in response to interrogation, and prior to his being advised of his *Miranda* rights. Concluding that the officer's conduct and statements would not prompt an answer from petitioner, the Circuit Court denied petitioner's motion to suppress. Petitioner was convicted by a jury of all counts.[1] He noted a timely appeal to the Court of Special Appeals, and, in an unreported opinion, that court affirmed the judgment. We granted petitioner's writ of certiorari. *Drury v. State,* 364 Md. 139, 771 A.2d 1069 (2001).

## II.

Petitioner argues before this Court that confronting a suspect in custody with physical evidence of a crime and telling him that the evidence will be processed for fingerprints is the functional equivalent of interrogation and that, in the absence of a valid *Miranda* waiver, any subsequent statements must be suppressed. The State concedes that petitioner was in custody.[2] The State argues that under the circumstances presented in this case, the officer's conduct was not the functional equivalent of interrogation and that *Miranda* warnings were therefore unnecessary.

## III.

It is a basic principle that a statement taken during custodial interrogation conducted before a defendant is informed of his or her *Miranda* rights may not be used by the State in its case in chief against the defendant. The test to be applied in determining whether the police officer's statements

---

1.  Petitioner was sentenced to a term of imprisonment of five years on the second degree burglary and a term of imprisonment of five years on the theft charge, to be served consecutively, with all but six months suspended and five years probation commencing upon his release from incarceration. The court merged the fourth degree burglary charge for sentencing purposes.

2.  The record before us is devoid of any information shedding light on whether any warrant or charging document had been issued prior to the officer "[picking] up Mr. Drury for questioning."

and exhibition of the physical evidence was tantamount to interrogation is whether the words and actions of the officer were reasonably likely to elicit incriminating responses from petitioner. *See Williams v. State,* 342 Md. 724, 760, 679 A.2d 1106, 1124–25 (1996).

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court considered whether Innis, the defendant, was subject to "interrogation," as the term was used in *Miranda. See Innis,* 446 U.S. at 298, 100 S.Ct. at 1688, 64 L.Ed.2d 297. The Court concluded that the meaning of "interrogation" is not limited to express questioning; it also includes its "functional equivalent." *See id.* at 300, 100 S.Ct. at 1689, 64 L.Ed.2d 297. The Court stated:

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of the police officers that they *should have known* were reasonably likely to elicit an incriminating response."

*Id.* at 300, 100 S.Ct. at 1689–90, 64 L.Ed.2d 297.

While the *Innis* inquiry focuses primarily upon the perception of the suspect rather than the intent of the police, the

Court noted that the intent of the police is not irrelevant "for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Id.* at 302 n. 7, 100 S.Ct. at 1690 n. 7, 64 L.Ed.2d 297.

## IV.

We turn now to the question of whether it can be fairly concluded that petitioner was subjected to the functional equivalent of interrogation. We find that the officer's conduct and words were the functional equivalent of interrogation within the meaning of *Innis*.

It is undisputed that, although petitioner was in custody, he was not subjected to express interrogation. The officer did not ask petitioner questions, but rather made a statement to him and displayed the tire iron and magazines.

Petitioner had been brought to the police station for the express purpose of questioning and, in fact, had been told so by Corporal Whaley. The police were not engaged in routine booking procedures; they were not required by any Maryland rule or procedure to read any document (other than the *Miranda* rights) to petitioner. Nonetheless, the officer placed the tire iron and the trash bag containing the stolen magazines on the table before petitioner before advising him of his *Miranda* rights. The officer told petitioner that he was going to send the evidence to be examined for fingerprints. Moreover, the officer testified that he "was presenting the evidence that was going to be used for questioning."

It appears to us that the only reasonable conclusion that can be drawn from the foregoing facts is that the officer should have known, in light of his having told petitioner that he was being brought in for questioning, that putting the evidence before petitioner and telling him that the items were going to be fingerprinted was reasonably likely to evoke an incriminating response from him. The only plausible explanation for the officer's conduct is that he expected to elicit a statement from petitioner.

The Court of Appeals of New York reached the same conclusion in *People v. Ferro*, 63 N.Y.2d 316, 482 N.Y.S.2d 237, 472 N.E.2d 13 (1984). Ferro was arrested for murder during the course of a robbery in which some furs were stolen. The police gave him his *Miranda* warnings, and he declined to answer any questions, but asked to speak to a District Attorney. Ferro was placed in a cell, and an officer placed the stolen furs on the floor outside of Ferro's cell. After telling the police officer that he still wished to speak to the District Attorney and would talk if the prosecutor could "do something for him," Ferro made some incriminating statements. The New York Court of Appeals held that Ferro was interrogated and that the officer should have known that placing the furs in front of his cell was reasonably likely to elicit an incriminating response from the defendant. *See id.* 482 N.Y.S.2d 237, 472 N.E.2d at 17. The court reasoned that "[w]here as here, . . . the only possible object of the police action in revealing evidence to a defendant is to elicit a statement from him, it does no violence to logic to conclude that the police should have known that it would do so." *Id.* (citations omitted).

The State relies on *Vines v. State*, 285 Md. 369, 402 A.2d 900 (1979), *State v. Conover*, 312 Md. 33, 537 A.2d 1167 (1988), and *Williams v. State*, 342 Md. 724, 679 A.2d 1106 (1996), to support its argument that petitioner was not subjected to police interrogation by Corporal Whaley. We find each of these cases distinguishable.

In *Vines*, the defendant was arrested in his home during the execution of a search warrant and then taken to the police station. *See Vines*, 285 Md. at 372, 402 A.2d at 901. The police advised Vines of his *Miranda* rights, and Vines invoked his right to remain silent. *See id.* He was then booked and taken to the roll call room where, displayed on the table, were drugs that the police had seized pursuant to the warrant. *See id.* at 369, 402 A.2d at 901–02. Vines was given a copy of the warrant, including the inventory of the seized property, and told that "this is what was recovered from his house during the raid." *Id.* at 373, 402 A.2d at 902. Vines then stated that

" 'it was his stuff' " and asked " 'what he could do to help himself out.' " *Id.*[3]

We held that there was no interrogation in violation of *Miranda. See id.* at 378, 402 A.2d at 905. Vines was given the copy of the warrant and the inventory of the property taken from his home pursuant to the Maryland Rules, which "provided that an officer taking property under a search warrant shall make a written inventory of the property taken in the presence of the person from whom the property is taken if such person is present at the time the warrant was executed." *Id.* at 377, 402 A.2d at 904. Moreover, the officer's statements did not stray from the ambit of the Maryland Rules; he "merely made the true statement that this was what was recovered from Vines' house during the raid." *Id.* at 378, 402 A.2d at 904. Giving the inventory to Vines in compliance with the rules, together with the simple factual statement linking the contraband to the inventory, was not tantamount to interrogation within the meaning of *Miranda. See id.* at 377, 402 A.2d at 904–05.

In sharp contrast, petitioner was not being processed, the police were not serving a warrant or inventory upon him pursuant to a Maryland rule, and they did not merely place the tire iron and stolen magazines before him. The officer told petitioner that they were going to process the items for

---

**3.** Although the case predated *Innis*, this Court noted that nonverbal police conduct could be tantamount to interrogation for *Miranda* purposes. *See Vines,* 285 Md. 369, 376, 402 A.2d 900, 903–04 (1979). We did not, however, have the benefit of the *Innis* language reasoning that interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). We noted that whether police conduct was tantamount to interrogation depends upon the facts and circumstances of the particular case, and that the cases throughout the country presented a wide variety of fact patterns and judicial attitudes, presenting no clear pattern that we were persuaded to follow. *See Vines,* 285 Md. at 376, 402 A.2d at 904. The same is virtually true today.

Because we fine *Vines* distinguishable, it matters not that the qualifying language of *Innis* was not a consideration.

fingerprints. Considering that the officer brought petitioner to the station for the specific purpose of questioning him, it hardly strains logic to conclude that the officer should have known that his conduct and words would elicit an incriminating response.

Neither *Conover* nor *Williams* add any weight to the State's argument. In *Conover*, as in *Vines*, the defendant was arrested and invoked his *Miranda* rights. *See Conover*, 312 Md. at 37, 537 A.2d at 1169. The police, in compliance with the Maryland Rules, read and gave to him a copy of the Statement of Charges, including the application for the statement of charges, suggesting that he read them and ask any questions that he had. *See id.* at 42, 537 A.2d at 1171. Conover then made a self-incriminating statement. Following our earlier decision in *Vines*—that routine processing of an arrested defendant does not amount to interrogation under Miranda—we found "no sinister motive [in] the fact that the police provided [Conover] with a copy of the Application as well as a copy of the Statement of Charges." *Id.* As noted above, in the case before us, there was no analogous official basis or procedural rule requiring Corporal Whaley to act as he did. The only reasonable explanation for his conduct is that he intended to elicit a statement from petitioner.

*Williams* is also distinguishable. Williams was arrested and, in response to his inquiry as to why he was arrested, was informed that he was under arrest for a double murder. *See Williams*, 342 Md. at 758, 679 A.2d at 1124. One of the officers showed him a photograph purportedly of Williams using one of the victims' ATM cards. *See id.* Williams stated that "that's me." *Id.* Williams was then given his *Miranda* rights, at which point he invoked his right to remain silent and requested an attorney. *See id.* When the officers began to gather their papers, one of them told Williams to remove his earring, and Williams mumbled, "you can't get me. I'll just say a girl gave me the card." *Id.* One of the officers commented that "this is going to work" and again told Williams that he was being charged with two murders. *Id.* Williams then said "I am never going to get out." *Id.*

The trial court suppressed the first statement, but not the second or third. This Court agreed, holding that the second and third statements were not the result of interrogation because the words and actions of the police following the *Miranda* warnings were not reasonably likely to elicit an incrimination response. We noted that the officers, in gathering their papers and telling Williams to remove his earring, were engaged in "routine procedures that the officers could hardly be expected to anticipate would prompt an incriminating statement." *Id.* at 760–61, 679 A.2d at 1125. Like *Vines* and *Conover, Williams* is easily distinguished from the case before us on the basis that the police conduct in this case was not routine police procedure nor "innocuous comment." Corporal Whaley's actions were aimed at invoking an incriminating remark.

As demonstrated above, the facts in this case suggest that petitioner was subject to custodial interrogation prior to being advised of his *Miranda* rights. Corporal Whaley had reason to know that his conduct was reasonably likely to elicit an incriminating response; indeed, there is no explanation for his conduct but that he expected to elicit such statements. In stark contrast to the cases relied on by the State, this is not a case where a suspect incriminated himself while police officers merely conducted routine arrest procedures. Accordingly, we hold that the trial court should have suppressed the statements that petitioner made before he was given his *Miranda* warnings.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

CATHELL and BATTAGLIA, JJ., dissent.

BATTAGLIA J., dissenting.

I respectfully dissent.

At approximately 5:40 a.m. on July 14, 1996, Corporal Whaley of the Centreville Police Department responded to a call reporting a breaking and entering and theft at the Hillside Market in Centreville, Maryland. During the course of his investigation, Corporal Whaley found a tire iron, which had been used to break into the store. The investigation also revealed that the suspects had stolen $1,370.00 worth of instant scratch off lottery tickets, $299.00 worth of adult magazines, $800.00 worth of cartons of cigarettes, and $104.92 worth of alcoholic beverages. A later search of refuse by Corporal Whaley revealed a trash bag containing several adult magazines and one empty malt liquor bottle.

Thereafter, on July 15th, Corporal Whaley went to the place of employment of Mr. Carl Kirby to speak with him about the incident. Kirby revealed that the petitioner, Dwayne Drury, and another individual, David Reinecke, committed the Hillside Market theft.

Later that same day after talking with Kirby, Corporal Whaley went to Drury's residence from whence he and Drury traveled to the Centreville Police Department to discuss the matter. Drury and Corporal Whaley were in the Corporal's office at the police station when the following occurred, as recounted by Corporal Whaley:

Whaley: I was stating, I placed the evidence up on my desk, which I was going to be presenting to Mr. Drury, and while presenting it, I was explaining to him the process that was going to be taking place, as far as when I showed him the tire iron, I advised him I it would be sent off for—to lift possible latent prints as far as the individuals that were the perpetrators, at which time Mr. Drury made the statement to me that his prints could possibly— were probably on that tire iron because there are hundreds of tire irons around Centreville.

State: Did you show him anything else?

Whaley: When I was picking the bag up to show it to him, he made the statement that he advised me [of] the contents of the bag, and he made the statement that he had already touched it.

State: By the bag, you mean the trash bag you found in the alley way?

Whaley: That's correct.

State: What did he say?

Whaley: He stated that the magazines were in it. He did not mention the malt liquor bottle.

State: Was that before you showed him the contents?

Whaley: That's correct.

State: What did he say?

Whaley: He said he knew what was in the bag. He basically told me the magazines were in the bag, that he had touched them.

State: And that's pretty much the end of your discussion with Mr. Drury?

Whaley: That's correct. He chose to exercise his right not to talk to me.

Drury was released, without arrest.

After further investigation, Drury was arrested on July 26, 1996, and charged with burglary in the second degree pursuant to Maryland Code (1957, 1996 Repl.Vol.) Art. 27, Section 30(a), burglary in the fourth degree pursuant to Maryland Code (1957, 1996 Repl.Vol.) Art. 27, Section 32(a)(2) and (c), theft pursuant to Maryland Code (1957, 1996 Repl.Vol.) Art. 27, Section 342, malicious destruction of property pursuant to Maryland Code, (1957, 1996 Repl.Vol.) Art. 27, Section 111, and common law conspiracy.

Prior to trial, petitioner moved to suppress the statements he made to Corporal Whaley upon his arrival at the police station on the grounds that he had not been given his *Miranda* warnings. The thrust of his argument was that Corporal Whaley had intended to elicit an incriminating statement when he placed the evidence on his desk and informed Drury

that it would be processed for fingerprints. The trial court denied the motion to suppress, stating:

> Just saying he was going to do it, he got the evidence bag and he said he put it down on the desk or table in front of him, meaning the officer, you asked him specifically that, and he, your client then, according to the officer, just made these statements. In some ways they weren't even apropos of anything that was said, he said he was going to send them off. Just doesn't seem to me that that is something that would prompt an answer.

Petitioner argues, and the majority agrees, that the trial court improperly denied his motion to suppress because by confronting Drury with the physical evidence of his crime and informing him that the evidence would be processed for fingerprints, Corporal Whaley engaged in the functional equivalent of an interrogation in violation of Drury's Fifth Amendment privilege against self-incrimination. I do not agree. The situation presented does not differ significantly from the scenario that arises when a suspect is in custody and is expressly questioned while being "booked," when *Miranda* warnings are not required.

From the majority's perspective, being brought by police officers to, and crossing the threshold of, the police station creates an environment which is instantaneously infused with coercive and compelling elements for a suspect. In their view, being taken to the police station *itself* could be sufficient to trigger the administration of *Miranda* warnings. In contrast, however, in *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), in which the drunken driver was in custody at the police station, the Supreme Court recognized that there is a distinction between questions or situations involving coercion designed to elicit information for investigatory purposes and requiring administration of *Miranda* warnings, and communication between police officers and suspects, such as pre-*Miranda* booking questions. In *Muniz*, a plurality of the Court determined that the *Miranda* warnings are not required before "routine" booking questions are asked. *See* 496 U.S. at 601, 110 S.Ct. at 2650, 110 L.Ed.2d at 552.

This Court in *Hughes v. State,* 346 Md. 80, 695 A.2d 132, *cert. denied,* 522 U.S. 989, 118 S.Ct. 459, 139 L.Ed.2d 393 (1997), recognized that not all questions proffered to a suspect during the booking process are so immunized and suggested that careful scrutiny of the factual setting of each encounter was required. *Id.* at 94–95, 695 A.2d at 139 (explaining that for the booking question exception to apply, "the questions must be directed toward securing simple identification information of the most basic sort") (quoting *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1113 & n. 2 (2nd Cir.1975), *cert. denied sub. nom., Hines v. Bombard,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976)) (internal quotations omitted).

In the present case, Drury was not confronted with a situation in which he was questioned at all or asked for a response to which he would have to decide among truthfulness, falsity or silence—the "trilemma" discussed in *Muniz.* 496 U.S. at 596–97, 110 S.Ct. at 2647–48, 110 L.Ed.2d at 549. Rather, he blurted out an explanation about his fingerprints and the trash bag, which he intended to be exculpatory and explanatory.

Furthermore, Corporal Whaley posed no question to Drury, which would call for an answer or expression of an opinion; the officer simply informed Drury that the evidence would be sent off for fingerprinting. *See United States v. Allen,* 247 F.3d 741, 765 (8th Cir.2001), *petition for cert. filed,* (U.S. Oct. 22, 2001) (No. 01–7310) ("Informing a suspect that he has been identified in a lineup contributes to the intelligent exercise of his judgment and may likely make firm his resolve to refuse to talk to the police without counsel."); *United States v. Payne,* 954 F.2d 199, 203 (4th Cir.1992), *cert. denied,* 503 U.S. 988, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992) (agent's statement to defendant which did not seek or require a response was not an interrogation); *United States v. Jackson,* 863 F.2d 1168, 1172 (4th Cir.1989) (DEA agent's statement which was in the form of a declaration, not a question, was not the functional equivalent of an interrogation where defendant responded to hearing the agent's declaration by making a false exculpatory statement which was used against him at trial); *United States v.*

*Comosona*, 848 F.2d 1110, 1112–13 (10th Cir.1988) (agent's act of giving defendant his business card and inviting defendant to call him if he wanted to talk to him about the incident after defendant had invoked his right to counsel was not an impermissible interrogation as contemplated by the Supreme Court's decisions in *Miranda* and *Innis* ); *Virgin Islands v. Kidd*, 79 F.Supp.2d 566, 574 (D.Vi.1999) (finding no interrogation took place where a defendant confessed to committing the crime after one of the police officers initiated a conversation with the defendant about his family); *Weber v. State*, 326 Ark. 564, 933 S.W.2d 370, 373 (1996) (finding no interrogation where the defendant made an inculpatory statement prior to arrest upon being greeted by the police officer); *State v. Porter*, 303 N.C. 680, 281 S.E.2d 377, 384–85 (1981) (where a radio exchange between two officers inquiring of one another as to whether the bank bag had been recovered prompted defendant to inform the officers that "the bank bag is in the car" followed by the officer clarifying by asking, "What bank bag?" and defendant's statement, "The bag from the robbery" was found not to be the product of an interrogation).

While it is clear from the facts of this case that petitioner was not subjected to an express interrogation by Corporal Whaley prior to being informed of his *Miranda* rights, such as in the booking situation, Drury, nevertheless, argues that he was subjected to the "functional equivalent of an interrogation" as explicated in the United States Supreme Court's decision in *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307–08 (1980). That is not the case here, however.

The Court in *Innis* set forth the following explanation of what constitutes an interrogation as contemplated by the *Miranda* decision:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to

arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

446 U.S. at 300–02, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 307–08. (emphasis in original).

The Fourth Circuit Court of Appeals noted that "the *Innis* definition of interrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." *Payne*, 954 F.2d at 202; *see Tucker v. Warden*, 175 F.Supp.2d 999, 1002–03 (S.D.Ohio 2001) (stating that "to determine whether a suspect has been 'interrogated,' the heart of the inquiry focuses on police coercion, and whether the suspect has been compelled to speak by that coercion") (quoting *State v. Tucker*, 81 Ohio St.3d 431, 692 N.E.2d 171, 175 (1998)); *Kirby v. Senkowski*, 141 F.Supp.2d 383, 395 (S.D.N.Y.2001) (stating that for statements to be suppressed as a violation of the Fifth Amendment privilege against self-incrimination, "the statements must be the result of compulsion"); *United States v. Castorena–Jaime*, 117 F.Supp.2d 1161, 1170 (D.Kan.2000) ("... absent a showing of coercion or other misconduct by law enforcement, an arrestee's volunteered statements made before receiving the *Miranda* warning may be used against him.")

Ascertaining whether a particular situation involved an interrogation or the functional equivalent of an interrogation depends on the facts and circumstances of each case, "particularly whether the statements are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given." *Allen*, 247 F.3d at 765. While it is true that a direct question need not be posed to a criminal defendant in order to constitute the functional equivalent of an interrogation, *see Innis*, 446 U.S. at 301, 100 S.Ct. at 1689–91, 64 L.Ed.2d at 308, I believe that Corporal Whaley's direct factual statement that the items would be processed for fingerprinting does not rise to the level of coercion or compulsion contemplated in *Innis* as being the functional equivalent of an interrogation. As the Fourth Circuit Court of Appeals explained in *Payne:*

> That no comment on the evidence in a case will ever issue in the presence of a criminal suspect seems to us neither realistic nor desirable as an absolute rule derived from the Fifth Amendment. Indeed, it may even be in the interest of a defendant to be kept informed about matters relating to the charges against him.

> \* \* \*

> We thus reject [Payne's] argument that statements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect constitute interrogation as a matter of law. It simply cannot be said that all such statements are objectively likely to result in incriminating responses by those in custody. The inquiry mandated by *Innis* into the perceptions of the suspect is necessarily contextual ... and whether descriptions of incriminating evidence constitute the functional equivalent of interrogation will depend on circumstances that are too numerous to catalogue. As a result, substantial deference on the question of what constitutes interrogation must be paid to the trial courts, who can best evaluate the circumstances in

which such statements are made and detect their coercive aspects.

954 F.2d at 202–03. The same result occurred in *Williams v. State*, 342 Md. 724, 760–61, 679 A.2d 1106, 1125 (1996) when this Court did not suppress an incriminatory statement made by a defendant in custody in a police station after police advised him that they had evidence establishing his guilt, although the defendant had invoked his right to an attorney and one was not present.

Although one could opine that Corporal Whaley was being deceptive in his placement of the evidence on the desk in front of Drury simultaneously with his declaration that the items would be processed for fingerprints, that opinion is not enough of a basis to require suppression of Drury's statement. It is not improper to confront a suspect with the factual or physical evidence of his or her allegedly criminal act. Numerous federal and state jurisdictions have rejected what Drury asserts when they have considered a wide range of factual scenarios which involved confronting a suspect with physical evidence of the crime or a verbal recitation to the suspect of the evidence against him. *See Allen*, 247 F.3d at 764–65 (holding that informing the suspect that three out of four eyewitnesses placed him at the scene of the crime was "a simple description of the status of the ongoing investigation" and not the functional equivalent of an interrogation for purposes of the Fifth Amendment); *Payne*, 954 F.2d at 203 (holding that agent's statement to defendant during post-arrest transport by the FBI informing defendant that agents had found a gun in his home after which defendant made an inculpatory remark was not an interrogation); *Lewis v. State*, 509 So.2d 1236 (Fla.App. 4th Dist.1987), *cert. denied*, 486 U.S. 1036, 108 S.Ct. 2025, 100 L.Ed.2d 612, (1988) (trial court did not err in failing to suppress defendant's statement, "Man, he took it like a man. I should have hit him a couple more times," which defendant made while police were showing him a videotape of the robbery because the act of showing the tape

was not the functional equivalent of an interrogation); *State v. McLean*, 294 N.C. 623, 242 S.E.2d 814, 818 (1978) (finding that by displaying the suspect's belongings found at the scene of the crime to the suspect while he was in custody, but had not been given the *Miranda* warnings, the officer did not engage in conduct which was "inquisitional in nature," thus the suspect's statements were not the product of an interrogation).

It is also important to note that Drury was not arrested on July 15, 1996, after he gave his explanation. He was arrested on July 26, 1996, after additional investigation.

Thus, my analysis reveals that Drury's pre-*Miranda* custodial statements concerning the physical evidence of his crime were the product of his own free will and consciousness, rather than the result of an interrogation. I believe the majority stretches the holding of *Innis* to conclude that under the circumstances present in this case, of having the defendant view physical evidence of the crime and of having a police officer state that the evidence will be processed for fingerprints, is tantamount to an interrogation. I agree with the Circuit Court's decision to deny Drury's motion to suppress his unwarned statement, for I find no Fifth Amendment violation. Accordingly, I would affirm the decision of the Court of Special Appeals.

Judge CATHELL has authorized me to state that he joins in this dissent.