Timothy **KIRBY,** Petitioner,

v.

Daniel A. **SENKOWSKI,** Warden, Clinton Correctional Facility, Respondent.

No. 97 Civ. 3329(DC).

United States District Court, S.D. New York.

April 17, 2001.

Timothy Kirby, Auburn Correctional Facility, Auburn, New York City, Petitioner, pro se.

Robert M. Morgenthau, District Attorney, New York City, By: Karen Heiss Eisen, Assistant District Attorney, New York City, for Respondent.

## OPINION

CHIN, District Judge.

*Pro se* petitioner Timothy Kirby brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his March 17, 1986 conviction in the Supreme Court of New York, New York County, for murder in the second degree (N.Y. Penal L. § 125.25(1)); attempted murder in the second degree (N.Y. Penal L. §§ 110.00 & 125.25(1)); and assault in the first degree (N.Y. Penal L. § 120.10(1)).

Kirby contends that his convictions violated (1) his Fourteenth Amendment right to due process; (2) his Fifth Amendment right against self-incrimination; (3) his Fifth and Sixth Amendment rights to counsel; (4) the Fifth Amendment prohibition against double jeopardy; and (5) the federal wiretap statute. For the reasons set forth below, the petition is denied.

## BACKGROUND

### A. *The Facts*

On September 26, 1977, Michael Houze, a friend of Kirby, and Leroy West robbed Robert Robinson. (Trial Transcript ("Tr.") at 120, 169–70, 176). Later that day, Robinson encountered Houze and West a second time. (*Id.* at 117, 120). When Houze went for his weapon, Robinson shot and killed him. (*Id.* at 120). Thereafter, Kirby told Sandra Richardson, a former girlfriend of both Robinson and Kirby, that he was going to avenge Houze's death by killing Robinson. (*Id.* at 164, 616–18).

On January 11, 1979, John Burwell and Robinson went into the Dunbar Tavern in Manhattan. (*Id.* at 129). After having a drink, Robinson asked Burwell to drive him to the Bronx. (*Id.*). Burwell agreed and the two men walked to Burwell's gypsy cab, which was parked on 150th Street. (*Id.*).

Burwell got into the driver's seat of the cab and Robinson got into the front passenger seat. (*Id.* at 130). As Robinson turned to lock the door, he saw Kirby and his co-defendant Freddie Franklin standing in the street with guns. (*Id.* at 130, 132–33). Franklin and Kirby fired the guns and Robinson ducked. (*Id.* at 130, 135). Despite suffering multiple gunshot wounds, Robinson lived. (*Id.* at 347). Burwell was found dead at the scene. (*Id.* at 77).

When the gunfire stopped, Robinson raised his head and saw Franklin and Kirby running away. (*Id.* at 131). Robinson then noticed a cab driving down 150th Street. He hailed the cab and asked the driver, Lee Williams, for assistance, but Williams told him that he did not want to get involved. (*Id.* at 136). Robinson then got a friend, who had come out of the tavern, to give him a ride to Harlem Hospital. (*Id.* at 137).

Williams later testified at trial that, at the time of the shooting, he heard a noise that sounded like firecrackers as he was waiting for a fare on Eighth Avenue. (*Id.* at 529). He then pulled up to 150th Street and saw two men firing into a parked cab. (*Id.* at 529–30, 545). He noted that the men firing were black and in their late teens or early twenties, but was not able to identify Kirby as one of them. (*Id.* at 534–35, 542). Williams then pulled onto 150th Street, turned on his high beams, and blew his horn. The two men ran away. (*Id.* at 535–36).

On January 16, 1979, Kirby was arrested and taken to the 25th Precinct. (*Id.* at 405–06). Upon his arrival, he was placed in a busy clerical room and handcuffed to the wall. (*Id.* at 408, 410). Over the course of the afternoon, Detective Robert Magnuson, who was assigned to investigate the shooting, placed a series of phone calls for Kirby. (*Id.* at 407–09).[1] During these calls, Kirby was never left alone, as police personnel continually walked in and out of the room where Kirby was located. (*Id.* at 410).

Magnuson first placed a call to Kirby's attorney, Selig Lenefsky. (*Id.* at 408). After speaking with his attorney, Kirby then asked to call his mother and his girlfriend, Gina Duncan. (*Id.* at 409, 417). To place both calls, Magnuson, unseen by Kirby, dialed the number Kirby gave him and told the person who answered that Kirby was on the line. (*Id.* at 409). After removing the mouth microphone from the telephone handpiece, Magnuson then told Kirby to pick up the receiver on another extension and monitored Kirby's conversations with his mother and Duncan. (*Id.*).

Magnuson placed the first phone call to Kirby's mother. (*Id.* at 410). During Kirby's conversation with his mother, Magnuson heard Kirby tell her that "Miles has to take care of something important for me . . . because they're coming there with a search warrant." (*Id.* at 415). Kirby also told her to "get rid of that Gina thing." (*Id.* at 415). At several points in the conversation Kirby expressed fear that the conversation was being taped. (*Id.* at 415–16).

After Kirby spoke with his mother, Magnuson went to Duncan's apartment to question her. (*Id.* at 462). When he returned, he placed a call to Duncan for Kirby in the same manner as the phone call to Mrs. Kirby. (*Id.* at 409, 417). During Kirby's conversation with Duncan, Duncan told Kirby that the police had just left her home, and that they had questioned her about him. (*Id.* at 420). Magnuson heard Kirby tell her that the case would be dismissed because "there was nobody in the street." (*Id.* at 422). He again expressed a concern that the conversation was being taped. (*Id.*).

At the time Magnuson monitored these two phone conversations, Franklin had not been arrested, the guns had not been recovered, and Robinson remained hospitalized. (*Id.* at 425). Franklin was later arrested and both he and Kirby were charged with murder in the second degree, attempted murder in the second degree, and assault in the first degree. (*Id.* at 9–10).

## B. *Prior Proceedings*

### 1. *State Court Proceedings*

Prior to trial Kirby, through his counsel Lopez, moved to suppress the statements he made during the phone conversations with his mother and Duncan (the "January 16th statements"). On March 10, 1980, following an evidentiary hearing, Justice Thomas Galligan of the Supreme Court of New York, New York County, denied Kirby's suppression motion and authorized the admission of the January 16th statements, finding that Kirby had no expectation of privacy when he made the statements at the police station. (Pet'r Br. to Appellate Division, dated November 1987, attached as Ex. A to Respondent's Appendix ("App."), at 11). Justice Galligan further held that any such expectation would have been unreasonable, given the fact

---

**1.** Magnuson had been told that the arresting officers had advised Kirby of his *Miranda* rights, but did not himself read Kirby his *Miranda* rights. (Hearing Transcript ("Hrg.") at 46).

that Kirby was in a room in which police personnel constantly passed through and that neither the guns nor Franklin had been found. (*Id.*). Justice Galligan did not address Kirby's arguments that admission of the statements violated his Fifth and Sixth Amendment rights. (*Id.*).

Kirby proceeded to a jury trial separately from Franklin. In March 1980, a mistrial was declared when the jury could not reach a verdict. Following the deadlock, Kirby and Franklin were tried together before another jury, resulting in a second mistrial in March 1981. A third jury trial of Kirby and Franklin likewise resulted in a mistrial in November 1981. *See People v. Kirby*, 112 Misc.2d 906, 907, 447 N.Y.S.2d 606 (N.Y.Sup.Ct.1982).

After the third mistrial, Kirby and Franklin moved to dismiss their indictment on the grounds that continued prosecution would subject them to double jeopardy, would constitute cruel and unusual punishment, and would not be in the interests of justice. In a decision dated February 2, 1982, Justice Harold J. Rothwax found that Kirby and Franklin's constitutional claims were without merit, but nevertheless dismissed the indictment because requiring the defendants to face additional juries would "offend[ ] traditional notions of fair play and substantial justice." *Id.* at 907–08, 913, 447 N.Y.S.2d 606. In the decision, Justice Rothwax remarked that due to Robinson's questionable credibility, "there is little likelihood that any jury would in the future reach unanimous agreement as to the charges." *Id.* at 907, 447 N.Y.S.2d 606.

The prosecution (the "State") appealed from the order and the Appellate Division, First Department, reversed, stating that the trial court's discretion had been "improvidently exercised." *People v. Kirby*, 92 A.D.2d 848, 849, 460 N.Y.S.2d 572 (1st Dep't 1983). Kirby and Franklin obtained leave to appeal from the Appellate Division's order, but on December 2, 1983, Kirby's appeal was dismissed for want of prosecution. Franklin's appeal was also later dismissed. (App.Exs.G, H).

On February 4, 1986, Kirby and Franklin proceeded to a joint trial before Justice Myriam Altman. Kirby was represented by Robert Race. Prior to the trial Justice Altman granted Kirby's motion for reargument of the suppression ruling, but adhered to Justice Galligan's original decision. (*Id.* Ex. A at 12–13). Evidence presented at the trial included testimony about the incident given by Robinson, Richardson, and Williams, among others.

On February 20, 1986, the jury convicted Kirby of the crimes charged in the indictment. Prior to sentencing, Kirby's attorney made a motion pursuant to N.Y.Crim. Pro. L. §§ 210.40, 330.30(1), 330.40, and 330.50 to set aside the verdict on the ground that the evidence adduced at trial was insufficient as a matter of law to establish Kirby's guilt. (*Id.* Ex. I). In addition, Kirby filed a *pro se* supplemental motion to set aside the verdict that alleged (1) ineffective assistance of counsel; (2) double jeopardy; and (3) various erroneous evidentiary rulings by the court. (*Id.* Ex. J). Justice Altman denied the motions in their entirety on March 17, 1986, and sentenced Kirby as a predicate felony offender to concurrent terms of imprisonment of twenty-five years to life, twelve and one-half years to twenty-five years, and seven and one-half years to fifteen years. (Ans.¶ 17).

On July 3, 1986, Kirby was granted permission to appeal and Michelle Fox was assigned to represent him. (App.Ex. L). On June 23, 1987, Kirby moved for reassignment of counsel for the purpose of perfecting his appeal. Fox joined in the motion on July 2, 1987. (*Id.* Exs. M, N). On July 30, 1987, the First Department

denied the motion without prejudice to a timely application by Kirby to file a *pro se* supplemental brief. (*Id.* Ex. O).

Thereafter, Fox filed a direct appeal to the Appellate Division, arguing (1) that the prosecution failed to prove Kirby's guilt beyond a reasonable doubt, and (2) that the admission of the January 16th statements violated Kirby's rights to counsel, his right against self incrimination, and his right to be free from unreasonable search and seizure. (*Id.* Ex. A). In a separate application, Kirby sought permission to file a *pro se* supplemental brief that would raise six additional claims: (1) double jeopardy; (2) ineffective assistance of counsel; (3) "perjurious testimony"; (5) denial of due process; and (6) "surreptitiously overheard statement during polygraph test." (*Id.* Ex. P). His request was denied on December 22, 1987. (*Id.* Ex. Q).

After granting Kirby permission to reargue the motion to file the supplemental brief, the Appellate Division adhered to its original ruling denying the motion. (*Id.* Exs. R, S). Kirby then sought leave to appeal this decision to the Court of Appeals and on April 8, 1988, Judge Joseph W. Bellacosa of the New York State Court of Appeals issued a certificate dismissing Kirby's application for leave to appeal the Appellate Division's ruling because the order sought to be appealed from was not appealable under N.Y.Crim. Pro. L. § 450.90. (*Id.* Ex. T). In a memorandum decision without opinion, dated June 2, 1988, the Appellate Division unanimously affirmed Kirby's conviction. (*Id.* Ex. U).

By letter dated June 13, 1988, Fox sought permission to appeal the Appellate Division's decision to the Court of Appeals. Fox noted that she was enclosing copies of the briefs submitted to the Appellate Division and requested that she be advised "of the judge designated to decide [the] application so that [she could] arrange for a hearing." (*Id.* Ex. V at 2). In a subsequent letter to Judge Bellacosa dated July 5, 1988, Fox attempted to raise two issues to the Court of Appeals: whether the monitoring of Kirby's phone calls violated his Fourth, Fifth and Sixth Amendment rights, and whether the Appellate Division's denial of Kirby's request to file a *pro se* supplemental brief violated due process. (*Letter from Fox to Bellacosa* ("Fox Letter"), dated July 5, 1988, at 1–4). In a letter to Judge Bellacosa dated July 21, 1988, but notarized on August 2, 1988, Kirby requested permission to file a *pro se* supplemental letter and detailed the six claims he attempted to raise to the Appellate Division in his earlier application to file a *pro se* supplemental brief—ineffective assistance of trial counsel, perjurious testimony, illegal eavesdropping, judicial "malfeasance," prosecutorial misconduct, and double jeopardy. (*Letter from Kirby to Bellacosa*, dated July 21, 1988 ("Kirby Letter"), at 1–3). Judge Bellacosa granted this request on July 26, 1988.[2] (App.Ex. X). By certificate dated September 6, 1988, permission to appeal was denied. (Ans.¶ 24).

### 2. *The Instant Case*

This case was filed on April 15, 1997.[3] In the original petition, Kirby contended

---

2. Other than the July 21, 1988 letter, the record does not contain any supplemental materials submitted by Kirby to the Court of Appeals. For the purposes of this petition, however, I will assume that Kirby submitted a pro se supplemental brief arguing the claims in his July 21, 1988 letter.

3. The petition is dated April 15, 1997. "A pro se petitioner's papers are considered filed when they are handed over to prison officials for forwarding to the court"; accordingly, this Court treats April 15, 1997 as the formal date of filing. *Rhodes v. Senkowski*, 82 F.Supp.2d 160, 165 (S.D.N.Y.2000); *see also*

that: (1) Magnuson's monitoring of Kirby's telephone conversations violated the federal wiretap statute; (2) Magnuson's monitoring of Kirby's telephone conversations also violated Kirby's Fifth and Sixth Amendment rights to counsel and his Fifth Amendment right against self-incrimination; and (3) the prosecutor failed to prove Kirby's guilt beyond a reasonable doubt and therefore his conviction violated the Fourteenth Amendment.

I dismissed the petition as untimely in a memorandum decision dated June 16, 1997. *See Kirby v. Senkowski,* No. 97 Civ. 3229(DC), 1997 WL 399663, at *1, 1997 U.S. Dist. LEXIS 10167, at *3 (S.D.N.Y. July 15, 1997). In light of *Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998), the Second Circuit vacated the decision and remanded for a determination of whether Kirby timely filed his petition with prison officials on or before April 24, 1997 and, if so, for a decision on the merits. (App.Ex. Z). By order dated October 22, 1998, I determined that the petition was timely filed and reinstated the petition. (*Id.* Ex. AA). Kirby's motion for leave to file an amended petition was granted on March 8, 2000. In addition to the claims raised in the original petition, the amended petition alleges ineffective assistance of counsel, prosecutorial misconduct, and double jeopardy.

## DISCUSSION

■ To obtain relief under 28 U.S.C. § 2254, a petitioner must show that he is in state custody in violation of the Constitution or laws of the United States, and must prove by a preponderance of the evidence that his constitutional rights have been violated. *See* 28 U.S.C. § 2254; *Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997). Section 2254(d)(1), as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), Pub L. No. 104–132, 110 Stat. 1214 (1996), "places a new constraint on the powers of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *See Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring). A federal court may issue a writ of habeas corpus only in cases where a state court determination was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See id.* at 376, 120 S.Ct. 1495; *Sacco v. Cooksey,* 214 F.3d 270, 273 (2d Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1107, 148 L.Ed.2d 977 (2001).

I address each of the petitioner's claims in turn.

### A. Sufficiency of the Evidence

Kirby first claims that his due process rights were violated because the evidence presented at his trial was insufficient as a matter of law to establish his guilt beyond a reasonable doubt.

#### 1. Procedural Default

The State initially argues that Kirby's legal sufficiency claim is procedurally barred. Specifically, the State contends that Kirby did not challenge the sufficiency of the evidence on direct appeal and did not fairly present this claim to the New York State Court of Appeals. Because New York law would prevent Kirby from raising this claim in a collateral proceeding, respondent further argues, it must be dismissed as an unexhausted, but forfeited, claim.

*Noble v. Kelly,* No. 00–2154, 246 F.3d 93, 2001 U.S.App. LEXIS 6012, at *7–9 (2d Cir. Apr. 5, 2001) (per curiam) (extending "prison mailbox rule" to habeas petitions).

A petitioner seeking habeas relief must first exhaust his available state court remedies by presenting the substance of his habeas claims to the state courts. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Strogov v. Attorney Gen.*, 191 F.3d 188, 191 (2d Cir.1999), *cert. denied*, 530 U.S. 1264, 120 S.Ct. 2723, 147 L.Ed.2d 987 (2000). The Second Circuit has devised a two-prong test to determine whether habeas claims satisfy the exhaustion requirement: "First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts.... Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim." *See Padilla v. Keane*, No. 00 Civ. 1235(VM)(AJP), 2000 WL 1774717, at *1, 2000 U.S. Dist. LEXIS 17340, at *6 (S.D.N.Y. Dec. 4, 2000) (citation omitted); *see also Klein v. Harris*, 667 F.2d 274, 282 (2d Cir.1981).

■ To fairly present a federal claim to the state courts, a petitioner need not cite "book and verse on the federal constitution." *Picard*, 404 U.S. at 278, 92 S.Ct. 509 (quoting *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir.1958)). Instead, a petitioner fairly presents a federal claim in one of four ways: a) relying on federal constitutional precedents; b) relying on state cases that themselves rely on federal cases and federal constitutional analysis; c) asserting a claim that inherently refers to a specific constitutional claim; or d) reciting facts common to constitutional rights and litigation. *See Daye v. Attorney Gen.*, 696 F.2d 186, 194 (2d Cir.1982) (en banc).

Kirby clearly challenged the sufficiency of the evidence on direct appeal. Point one of his appellate brief argues that "[t]he People failed to prove appellant's guilt beyond a reasonable doubt," and explicitly cites the Fourteenth Amendment. (App. Ex. A at 22). The brief then proceeds to point out inaccuracies in the testimony of Robinson, Richardson, and Magnuson. (*Id.* at 22–25).

Although the sufficiency claim was raised before the Appellate Division, it was not fairly presented to the Court of Appeals. As the Second Circuit has held, "arguing one claim in [a] letter [to the Court of Appeals] while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction." *Jordan v. Lefevre*, 206 F.3d 196, 198–199 (2d Cir. 2000); *see also Perez v. Greiner*, No. 99 Civ. 11806(WHP)(AJP), 2000 WL 915114, at *6, 2000 U.S. Dist. LEXIS 12667, at *21 (S.D.N.Y. Jul. 5, 2000) ("Perez's mere enclosure of his Appellate Division briefs in his leave to appeal application, without requesting the Court of Appeals to review all claims, is not sufficient [to exhaust his claims], and his claims therefore are unexhausted.").

■ On June 13, 1988, Kirby's appellate counsel, Michelle Fox, sent a letter to the Court of Appeals requesting permission to appeal. (App.Ex. V). In the letter counsel stated that she enclosed copies of the briefs submitted to the Appellate Division, but did not specifically alert the Court of Appeals to the sufficiency argument set forth in the Appellate Division brief. (*Id.*). In her follow-up letter to the Court of Appeals, Fox only advanced claims relating to the monitored statements and Kirby's right to file a supplemental *pro se* brief. (Fox Letter at 1–4). Moreover,

Kirby's *pro se* submission to the Court of Appeals made no mention of the sufficiency argument. (Kirby Letter at 1–3). Because neither Kirby or his counsel ever requested the Court of Appeals to review the sufficiency claim, it was never exhausted.

The sufficiency claim is also barred. New York Criminal Procedure Law §§ 440.10(2)(b) and (c) generally preclude a defendant from raising, in a collateral proceeding, trial errors that could have been presented on direct appeal. Here, Kirby could have presented the sufficiency claim to the Court of Appeals but failed to do so, thus forfeiting the unexhausted claim.

It is well settled that a habeas petitioner's "forfeiture in state court of his [constitutional] claims bars him from litigating the merits of those claims in federal habeas proceedings, absent a showing of cause for the procedural default and prejudice resulting therefrom." *Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir.1991); *see also Wainwright v. Sykes*, 433 U.S. 72, 87–91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In the instant case, Kirby has demonstrated neither cause for default nor resulting prejudice. Furthermore, based on the weight of the other evidence in the case, I am not persuaded that failure to consider the claim would result in a fundamental miscarriage of justice. *See Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Strogov*, 191 F.3d at 193. Therefore, the sufficiency claim is barred as an unexhausted and forfeited claim.

### 2. *The Merits*

Even assuming the sufficiency claim was not defaulted,[4] however, it still fails. A defendant challenging the sufficiency of the evidence underlying his conviction must demonstrate that, "viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir.) *cert. denied*, 515 U.S. 1136, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995). When reviewing a trial record that supports conflicting inferences, a habeas court must presume that, in convicting the defendant, the jury "resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326, 99 S.Ct. 2781. In addition, "[f]ederal habeas courts are not free to reassess the fact[-] specific credibility judgments by juries or to weigh conflicting testimony[; o]n collateral review, this Court must presume that the jury resolved any questions of credibility in favor of the prosecution." *Vera v. Hanslmaier*, 928 F.Supp. 278, 284 (S.D.N.Y.1996).

■ Applying these principles, I find that the evidence presented at Kirby's trial was sufficient to convince a rational trier of fact that the essential elements of the crimes were proven beyond a reasonable doubt. Robinson identified the defendants as the shooters. In addition, Williams corroborated Robinson's account of the shooting. Furthermore, Richardson's testimony introduced circumstantial evidence that Kirby intended to kill Robinson to avenge Houze's death. Taken together, this evidence was sufficient for the jury to convict.

---

4. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also* Lurie v. Wittner, 228 F.3d 113, 124 (2d Cir.2000), *cert. denied*, 121 S.Ct. 1404, 2001 U.S. LEXIS 2501 (2001).

## B. *Admission of January 16th Statements*

Kirby next argues that the admission of the January 16th statements violated his Fifth Amendment rights against self-incrimination and to counsel, his Sixth Amendment right to counsel,[5] and the federal wiretap statute.

### 1. *Fifth Amendment*

#### a. *Procedural Default*

■ The State argues that this Court may not reach the Fifth Amendment self-incrimination and right to counsel claims because they are procedurally barred under the Second Circuit's decision in *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993). As the Supreme Court has made clear, absent a showing of cause and prejudice or a fundamental miscarriage of justice, a federal habeas court may not review a federal claim that has been defaulted in state court pursuant to an independent and adequate state procedural ground. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "Because it can difficult to determine if [a] state law discussion is truly an independent basis for decision ..., [a state court's] reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir.2000) (quoting *Coleman*, 501 U.S. at 732, 735, 111 S.Ct. 2546) (internal citation and quotation marks omitted).

■ In *Quirama v. Michele*, the Second Circuit held that the requirement that a state decision clearly rely on state law does not apply to a state court's affirmance without opinion "unless there is good reason to question whether there is an independent and adequate state ground for the decision." *Quirama*, 983 F.2d at 14 (quoting *Coleman*, 501 U.S. at 739, 111 S.Ct. 2546) (internal quotation marks omitted). Thus, where the State argues on appeal that a claim is both procedurally barred and without merit, and the appellate court affirms without discussion, "there is no good reason to believe that the [appellate court's] silence reflects a decision on the merits." *Quirama*, 983 F.2d at 14. Accordingly, in such instances, the prisoner's claims are procedurally barred and not subject to federal review, absent a showing of cause and prejudice or a fundamental miscarriage of justice. *Id.*

■ In the instant case, Kirby argued to the Appellate Division that the admission of the January 16th statements violated his Fourth, Fifth, and Sixth Amendment rights. (App. Ex. A at 26–37). In response, the State argued that the Fifth Amendment claims were unpreserved and without merit. (*Id.* Ex. B at 25–30). The Appellate Division affirmed without opinion. *See Kirby*, 141 A.D.2d at 1009, 530 N.Y.S.2d 424. Accordingly, under *Quirama*, this Court must presume that the Appellate Division rejected the Fifth Amendment claims based on an adequate and independent state ground. Because Kirby has made no showing of cause and prejudice, or that failure to consider the claims would result in fundamental miscarriage of justice, the Fifth Amendment claims are not subject to federal review.[6]

---

5. Although Kirby initially asserts that the monitoring "violated his constitutional right to remain silent and not incriminate himself under the Fifth Amendment and his Sixth Amendment right to counsel," he later refers to his Fifth Amendment right to counsel. (Am. Pet. at 65, 76). I will therefore treat the petition as raising both right to counsel claims.

6. Because there is no prior "reasoned decision" addressing the Fifth Amendment claim on its merits, the claim is not "saved" by *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (holding that

## b. *The Merits*

Even assuming the Fifth Amendment claims are not procedurally defaulted, they must be rejected on the merits.

### i) *Fifth Amendment Self–Incrimination Claim*

■ Kirby first contends that the admission of the January 16th statements violated his Fifth Amendment right against self incrimination. In response, the State argues that the monitoring did not constitute a Fifth Amendment violation because Kirby voluntarily called his mother and girlfriend, and made statements during both conversations that demonstrated his knowledge of the police monitoring. For the reasons that follow, Kirby's claim fails.

■ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court set forth the standards by which persons detained by the police are to be made secure in their rights against self incrimination. Under *Miranda*, statements made by a suspect during custodial interrogation may not be admitted against the suspect unless the suspect was informed of, and waived, his rights, because the "process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not other-

wise do so freely." *Id.* at 467, 86 S.Ct. 1602.

Here, the key issues are (i) whether Kirby was subjected to custodial interrogation, and, if so, (ii) whether he was compelled by the circumstances into making incriminating statements. As the Supreme Court has made clear, interrogation includes not only "express questioning," but its "functional equivalent"—that is, "words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to have the force of a question on the accused and therefore be reasonably likely to elicit an incriminating response." *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (internal citation and quotation marks omitted); *see also Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *United States v. Gelzer*, 50 F.3d 1133, 1138 (2d Cir.1995). In addition, the statements must be the result of compulsion; "volunteered statements of any kind are not barred by the Fifth Amendment." *Innis*, 446 U.S. at 300, 100 S.Ct. 1682 (quoting *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602); *see also Nelson v. Walker* 121 F.3d 828, 833 (2d Cir.1997). Indeed, the rationale behind *Miranda* is the "prevent[ion of] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v.*

"[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground"). The merits of the Fifth Amendment claims were never addressed during the initial suppression hearing, the relitigation of the suppression hearing before the third trial, or the motion to set aside the verdict after the fourth trial. *See* App. Ex. A at 11–12 (stating that Justice Galligan did not address the Fifth or Sixth Amendment *Massi-*

*ah* issue raised by Kirby in his suppression ruling, and that the relitigation of the issue solely addressed *People v. Grimaldi*, a case relying on New York law); Exs. I, J (counsel and pro se motions to set aside the verdict do not raise Fifth Amendment issue). Even though Fox raised the Fifth Amendment issue to the Court of Appeals, the application for leave to appeal was denied and the Court of Appeals never reached the merits of the claim. (Ans.¶ 24).

*Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

In *Arizona v. Mauro,* the Supreme Court held that no functional equivalent of interrogation had taken place when an officer allowed a suspect's wife to speak to him in the officer's presence and then openly tape-recorded the suspect's statements. *See id.* at 527, 107 S.Ct. 1931. The Court upheld the admission of the statements because the officers did not ask the suspect any questions, and because there was no evidence that the officers' decision to allow the suspect's wife to see him "was the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation." *Id.*

In the instant case, Kirby contends that Detective Magnuson's actions constituted the "functional equivalent of interrogation" because he engaged in the very type of "psychological ploy" prohibited in *Mauro.* (Am. Pet. at 88, 90); *see also Mauro,* 481 U.S. at 527. Specifically, Kirby alleges that after he asked to call Duncan, Magnuson went to her house and interrogated her, knowing that it would provoke a discussion between Kirby and Duncan and hoping it would elicit incriminating statements. (Am. Pet. at 67, 72).

The contention is rejected. Kirby offers no evidence to suggest that his statements to his mother and girlfriend were involuntary, coerced, or the product of any interrogation. Indeed, the evidence is to the contrary.

First, Magnuson did not ask Kirby any questions, nor did he engage in any conduct that was even remotely the equivalent of interrogation. Indeed, Kirby initiated the phone calls by asking to make them; Magnuson merely placed them.

Second, Kirby could not have reasonably believed that the telephone calls were private or confidential. The calls were made by Magnuson, and Magnuson even spoke to the person on the other end of the line. Kirby was on a telephone in a busy clerical room at the 25th Precinct. The room was approximately eight by twelve feet in size and Kirby used a telephone on a desk midway in the room. Police personnel were walking in and out of the room. (Tr. at 408–09). This was hardly the place for a private or confidential conversation.

Third, as the record shows, Kirby was aware that his phone calls were being monitored. Magnuson took notes as he was listening on the other extension. He testified that during the telephone conversation Kirby stated:

> Mom, they are listening on this phone and they probably got your phone tapped. Hey officer how are you? You getting all this? I know you are there, you slick motherfucker.

(*Id.* at 415). Kirby argues that Magnuson's description of the conversation is not correct, but the hearing court believed Magnuson. (App. Ex. B at 6). Kirby knew Magnuson was listening and even tried to mock him.

Accordingly, the self-incrimination claim is rejected. *Cf. In re State Police Litig.,* 888 F.Supp. 1235, 1257 (D.Conn.1995) (holding, on motion for summary judgment, that issues of fact existed as to whether state troopers' surreptitious recording of arrestees' telephone conversations with attorneys and family members was "functional equivalent" of interrogation for purposes of Fifth Amendment), *appeal dismissed,* 88 F.3d 111 (1996).

### ii) *Fifth Amendment Right to Counsel Claim*

Kirby also raises a Fifth Amendment right to counsel claim with respect to the January 16th statements. In essence, he argues that by asking to telephone his lawyer, he invoked his right to counsel.

Once he did so, he argues, the police were no longer free to "interrogate" him.

 The Fifth Amendment right to counsel is included in the rights protected by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Requests for counsel must be explicit and unequivocal, and once a request for counsel has been made, all interrogation must cease unless a lawyer is made available to the suspect or the suspect re-initiates conversation with police. *See Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (citing *Edwards v. Arizona,* 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); *see also United States v. Perez,* 948 F.Supp. 1191, 1197 (S.D.N.Y.1996). Here, Kirby did ask to call counsel and had already spoken to his lawyer by the time Magnuson began monitoring the calls. Therefore, Kirby exercised his Fifth Amendment right to counsel and could not be interrogated absent voluntary waiver or initiation.

 The issue of whether Kirby's Fifth Amendment right to counsel was violated also turns on whether he was compelled to make statements in response to an "interrogation." Here, there was no direct interrogation, nor, for the reasons set forth above, was there any functional equivalent of an interrogation. Kirby's statements were not compelled and they were not the result of an "interrogation"; rather, he chose to speak to his mother and girlfriend in the setting of a busy precinct room, believing that his calls were being monitored. Hence, Kirby's Fifth Amendment right to counsel was not violated.

## ·2. Sixth Amendment

### a. Exhaustion

Unlike the Fifth Amendment claim, Kirby's Sixth Amendment claim is preserved for federal review. At the appellate level, the State solely argued the merits of the Sixth Amendment claim. (App. Ex. B at 25–29). Therefore, *Quirama* does not control, and this Court may not presume that the Appellate Division's affirmance without opinion rested on state procedural grounds. *See Quirama,* 983 F.2d at 14; *Harris v. Reed,* 489 U.S. 255, 265, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Moreover, the Sixth Amendment claim was presented to the Court of Appeals in Fox's July 5, 1988 letter seeking leave to appeal the Appellate Division's decision. (Fox Letter at 2–4). Thus, the claim is exhausted and I may review it on the merits.

### 2. The Merits

 Kirby alleges that the admission of the January 16th statements also violated his Sixth Amendment right to counsel.[7] The Sixth Amendment right to counsel attaches only after the initiation of adversary judicial proceedings, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *see also Leslie v. Artuz,* 230 F.3d 25, 32 (2d Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1206, 149 L.Ed.2d 120 (2001). Federal courts look to state criminal procedural law to determine when a state criminal action is commenced. *See Meadows v. Kuhlmann,* 812 F.2d 72, 77 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct.

---

**7.** Kirby also claims that the police monitoring of his conversation violated his indelible right to counsel under the New York State Constitution. *See People v. Hobson,* 39 N.Y.2d 479, 483–84, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976). As state law claims, including New York "indelible right to counsel" claims, are not cognizable on habeas, I do not address this allegation. *See Hurd v. Stinson,* 99 Civ. 2426(LBS), 2000 WL 567014, at *11, 2000 U.S. Dist. LEXIS 6275, at *42 n. 12 (S.D.N.Y. May 10, 2000).

3188, 96 L.Ed.2d 676 (1987). In New York, criminal proceedings are commenced with the filing of an accusatory instrument, such as a felony complaint. *See* N.Y.Crim. Proc. Law § 100.05 (McKinney 2000). New York courts have also held that the right to counsel attaches upon arraignment or the issuance of arrest warrant. *See Gonzalez v. Sullivan*, No. CV–88–1459, 1990 WL 126189, at *1 1990 U.S. Dist. LEXIS 11432, at *4 (E.D.N.Y. Aug. 30, 1990) (citing cases), *aff'd*, 934 F.2d 419 (1991).

■ Kirby was first indicted for the murder of Burwell and the attempted murder of Robinson on January 26, 1979. (Aff. of ADA Nancy Ryan in Response to Defts.' Mot. to Dismiss, ¶ 2, attached as Ex. D to App., at A15). According to the testimony of Detective Magnuson, Kirby was brought into the 25th Precinct the morning of January 16th, and he remained there until at least 6:30 p.m., when the phone call with Duncan ended. (Tr. at 406, 417, 423). This chronology shows that Kirby was not arraigned until after he made the January 16th statements. Additionally, there is no indication in the record that an arrest warrant or felony complaint was ever issued in this case before the statements were made. Because Kirby has failed to demonstrate that his Sixth Amendment right to counsel attached at the time of the monitoring, this claim also fails.

### 3. *Federal Wiretap Statute Claim*

#### a. *Procedural Default*

Kirby next alleges that "Magnuson's illegal surreptitious eavesdropping of his private telephone conversations" violated the

federal wiretap statute. (Pet. at 1). He does not provide a citation to the statute in his petition, but presumably he is referring to the version of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, that existed in 1979. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 19 U.S.C.C.A.N. (82 Stat. 197) 237, 254.

■ This claim, too, is procedurally barred. The record shows that Kirby never raised the federal wiretap statute as an issue in any prior proceeding. He has thus failed to satisfy the requirements of New York's contemporaneous objection requirement.[8] *See* N.Y.Crim. Pro. L. § 470.05. Moreover, Kirby did not fairly present the issue to the New York appellate courts, and may not bring the claim in a collateral proceeding. *See* N.Y.Crim. Pro. L. § 440.10(2)(c). Because Kirby has not demonstrated either cause for the default and resulting prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice, I may not reach the merits of the federal wiretap statute claim.

#### b. *The Merits*

Even if the claim were not procedurally defaulted, however, the claim fails on the merits.

■ In general, Title III "prohibits the intentional interception of wire communications, including telephone conversations, in the absence of authorization by court order." *United States v. Willoughby*, 860 F.2d 15, 19 (2d Cir.1988), *cert. denied*, 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978

---

**8.** Although Kirby referenced the New York wiretap statute (N.Y. Penal L. § 250.05, N.Y.Crim. Pro. L. § 700.05) in a footnote in his (counsel's) brief to the Appellate Division, the argument was never developed as a distinct claim and, in any event, constitutes a state law claim that cannot be raised in a habeas petition. (App. Ex. A at 35 n. 6).

(1989). Kirby's reliance on Title III, however, is misplaced, for at least two reasons.

First, Title III's prohibition does not apply when one of the parties to the communication has given prior consent to the interception, and such consent may be express or implied. *See id.* Here, for the reasons set forth above, Kirby had implicitly consented to the monitoring of his conversations. In view of the circumstances, he could not have expected the calls to be private or confidential. More importantly, he believed that the detective was listening and even addressed the detective directly, mocking him. He chose to speak to his mother and girlfriend nonetheless.

Second, Title III's proscriptions against interceptions of telephone conversations do not apply to the use of an extension telephone in the ordinary course of a subscriber's business. *See* 18 U.S.C. § 2510(5)(a)(i) (1968) (" 'electronic, mechanical, or other device' means any device or apparatus which can be used to intercept a wire or oral communication other than ... any telephone ... furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business"), (reprinted in 1968 U.S.Code Cong. & Adm. News at 254); *see Anonymous v. Anonymous,* 558 F.2d 677, 678–79 (2d Cir.1977). Here, Kirby used a telephone in a police precinct that was furnished to the New York City Police Department as the subscriber. The ordinary course of the Police Department's business is law enforcement, and, in the circumstances here, Detective Magnuson's use of the extension phone to listen in on the conversation of a suspect who could not have reasonably expected privacy was not inconsistent with the ordinary course of the Police Department's business.

The claim is rejected on the merits as well.

## C. *Ineffective Assistance of Counsel*

Kirby next claims that his trial counsel's representation was so inadequate that it deprived him of his Sixth Amendment right to counsel. Although Kirby notes forty-five examples of his counsel's purported inadequacy in his amended petition, the claims can be grouped into six general categories: (1) counsel's failure to introduce certain testimony that was introduced at his previous trials; (2) counsel's failure to vigorously cross-examine certain prosecution witnesses; (3) counsel's failure to object to the assistant district attorney's improper statements; (4) counsel's failure to present comprehensive legal arguments against the admission of evidence; (5) counsel's expression to the jury of lack of belief in Kirby's innocence; and (6) counsel's introduction of implausible alternative theories of the shooting.

### 1. *Exhaustion*

As Kirby raised his ineffective assistance claims in his submission to the Court of Appeals, the claims are properly exhausted and may be reviewed by this Court.

### 2. *The Merits*

To prevail on an ineffective assistance claim, a habeas petitioner must prove two elements: (1) his counsel's performance was deficient; and (2) counsel's deficient performance prejudiced his defense. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Lindstadt v. Keane,* 239 F.3d 191, 198, 204 (2d Cir.2001). More specifically, the "performance prong" requires a showing that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed

the defendant by the Sixth Amendment." *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. The "prejudice prong" requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. The Supreme Court has defined a reasonable probability as a "probability sufficient to undermine confidence in the outcome." *Id.*

When deciding an ineffective assistance of counsel claim, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052. Because there are countless ways to provide effective assistance in any given case, a court may not second-guess defense counsel's trial strategy. *See id.* at 689, 104 S.Ct. 2052. Thus, to succeed in an ineffective assistance claim, the defendant must overcome the "strong presumption that [defense] counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see also Clark v. Stinson,* 214 F.3d 315, 321 (2d Cir.2000), *cert. denied,* — U.S. ——, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001).

In his first category of claims, Kirby argues that his trial counsel failed to introduce alibi testimony that was introduced at his previous trials, including the testimony of his mother ("Mrs. Kirby"), Rita Richardson, Anthony Keith, and Gregory Stevens. Kirby claims that his mother would have testified (as he claims she did at his prior trials) that he was at home at the time of the crimes. He claims that Rita Richardson would have refuted her sister

Sandra Richardson's testimony that Kirby said he wanted Robinson dead. Finally, he claims that Anthony Keith and Gregory Stevens would have testified about a fight Burwell was involved in at the Dunbar Tavern. (Am. Pet. at 144–46). These contentions are without merit.

First, it appears that Mrs. Kirby never testified at Kirby's previous trials. In a letter to the Court dated November 16, 1999, Kirby contends that his mother signed a sworn affidavit that she gave alibi testimony, but that he has since lost that affidavit. He provides a copy of an order, signed by Justice Altman on April 23, 1986, that acknowledges receipt of an affidavit from Mrs. Kirby, but the order does not describe the contents of the affidavit. For the purposes of this petition, I will assume the affidavit stated that Mrs. Kirby had provided alibi testimony at the prior trials. This does not resolve the matter, however, for other evidence demonstrates that Mrs. Kirby did not testify. Justice Altman stated in her April 23, 1986 order that "[a] review of the transcripts of [Kirby's] three prior trials indicates that his mother did not testify at any of those trials." Moreover, the State has submitted an affirmation from Assistant District Attorney Michael G. Cherkasky, dated March 18, 1986,[9] which states that Mrs. Kirby never testified at any prior proceeding and that no alibi witness ever testified for Kirby. (App.Ex. K, ¶ 4). Finally, Kirby's trial counsel, Robert Race, emphatically denied, in a letter submitted to the First Department Disciplinary Committee,[10] that Mrs. Kirby ever testified on her son's behalf:

**9.** ADA Cherkasky prosecuted Kirby at the fourth trial only. In the affirmation, Cherkasky states that he reviewed the transcripts of the earlier three trials and spoke with Assistant District Attorney Nancy Ryan, "the assis-

tant who previously tried this case." (App. Ex. K, ¶ 4).

**10.** The letter, dated June 16, 1986 and submitted to the Court by Kirby in a packet of other materials, was apparently written in

With respect to the second allegation; "Alibi witness", this is blatantly false. At no time during any of the three prior trials was his mother ever a witness on his behalf. Furthermore, I spoke with Mrs. Kirby prior and during the trial and she could not testify for her son that on the date, time, and place of occurrence, she would be able to state with specificity that her son was in another location or that he was in her company.

(Letter from Race to Appellate Division, dated June 16, 1986, at 2). Based upon the record before the Court, it is clear that Mrs. Kirby never appeared as a witness at the earlier trials.[11]

 Second, even if Mrs. Kirby had testified at Kirby's prior trials, the failure to call her at the fourth trial did not amount to ineffective assistance. "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *Collier v. United States,* 92 F.Supp.2d 99, 104 (N.D.N.Y. 2000) (quoting *United States v. Eisen,* 974 F.2d 246, 265 (2d Cir.1992)). As Race observed in his letter, Mrs. Kirby would not have been able to provide alibi testimony if she had taken the stand. Accordingly, the decision not to call her as a witness

was not unreasonable, and thus did not constitute ineffective assistance.

Third, as to the remaining witnesses, Kirby has not demonstrated that his counsel's failure to call Rita Richardson, Anthony Keith, or Gregory Stevens constituted ineffective assistance. The *Strickland* standard does not allow a court to second guess actions or omissions by counsel that "might be considered sound trial strategy." *Strickland* 466 U.S. at 689, 104 S.Ct. 2052; *see also Mason v. Scully,* 16 F.3d 38, 42 (2d Cir.1994). Each of the decisions regarding the testimony of Richardson, Keith, and Stevens falls within the standard of conduct set forth in *Strickland.*

 According to Kirby, Rita Richardson testified at the first trial that, unlike Sandra Richardson, she did not recall Kirby's statement that he wanted Robinson dead. (Am. Pet. at 146). At the fourth trial, instead of calling Rita to refute the statement, Kirby's counsel got Sandra to admit that none of the people in the room—including Rita—heard Kirby say he wanted Robinson dead. (Tr. at 635–36). This type of trial strategy is expressly allowed under *Strickland.* Further, trial counsel might have felt it useless to call Rita because Sandra testified that Kirby made the statement to her alone and no-

response to a complaint Kirby had filed against Race with the Appellate Division, First Department Disciplinary Committee. (Letter from Robert Race to Appellate Division, dated June 16, 1986, at 1–2).

11. Kirby also contends that the State has "done [its] best to eradicate any proof that [his] Mother ever gave alibi testimony." (Am. Pet. at 120). He contends that proof of his mother's previous testimony would be found in the summations and jury charges of the earlier trials, which portions of the trials were apparently never transcribed. (*Id.* at 128). He also claims that his sentencing transcript does not reflect the actual exchange between counsel, defendant, and Judge Altman about

the alibi witness. Specifically, he claims that Mr. Race stated that Mrs. Kirby testified at the first and second trials, but not the third, and that ADA Cherkasky stated that he did not know what Mrs. Kirby testified to. (*Id.* at 125–26). The sentencing transcript does not show such a response by Mr. Race, and only indicates that ADA Cherkasky—who did not try any of the first three cases—said, "I can't recall what she testified. I know that she didn't testify at the last trial." (Sentencing Transcript at 6). In addition, Kirby claims that the Court knew his mother was a prospective witness because her presence in the courtroom was discussed during a bench conference. (Am. Pet. at 126).

body else in the room heard it. (*Id.* at 617–18). In any event, the failure to call Rita Richardson did not constitute ineffective assistance.

■ As to the testimony of Anthony Keith and Gregory Stevens, Kirby claims that these witnesses testified at the previous trials that they saw Burwell get into a fight with an individual in the Dunbar Tavern, and that Stevens in particular testified that the individual wore clothing similar to that first described by Robinson as the perpetrator's clothing. (Am. Pet. at 144, 172). Even assuming this testimony might have been helpful to Kirby, given the risks that exist any time a defendant in a criminal case calls witnesses, I am not persuaded that it was unreasonable for counsel to decline to call them at the fourth trial. Moreover, even if counsel's performance was deficient with respect to these witnesses, there is no evidence to suggest that the performance resulted in prejudice against Kirby.

■ In his second category of claims, Kirby alleges that his trial counsel failed to vigorously cross-examine the prosecution's witnesses, including Robinson, Magnuson, Williams, and Detective George Roberts, who accompanied Kirby to a polygraph test on August 8, 1978, in connection with an unrelated investigation. (Hrg. at 91). This group of claims is also without merit.

Despite Kirby's assertions otherwise, his trial counsel repeatedly challenged and impeached the prosecution's witnesses. For example, Kirby's counsel attacked Robinson's character by questioning him about his previous convictions, as well as his drug use and drug dealing. (Tr. at 161–64, 183–88). He further weakened Robinson's credibility by pressing him for details regarding his memory of the events that occurred the night of the shooting. (*Id.* at 198–223). In addition, he made substantial efforts to impeach Robinson with contra-

dictory testimony given at the previous trials. (*Id.* at 172–75, 182–85, 209–13, 216–19, 221–22).

Nor were these impeachment efforts limited to Robinson. Kirby's trial counsel interrogated Magnuson about police procedures allowing prisoner's conversations to be monitored. (*Id.* at 450–53, 465–70). He questioned the accuracy of the notes Magnuson took to record Kirby's conversation, and attempted to impeach Magnuson with prior inconsistent testimony he gave at the earlier trials. (*Id.* at 458–60, 473). During his cross-examination of Williams, Kirby's trial counsel stressed the fact that Williams could not identify either of the two gunmen he saw the night of the shooting. (*Id.* at 542). Finally, Kirby's trial counsel questioned Detective Roberts's memory of certain statements Kirby allegedly made during the polygraph examination. (*Id.* at 584–86). As Kirby's claims of ineffective assistance in this respect are clearly belied by the record, this group of claims fails.

■ In his third category of claims, Kirby contends that his trial counsel failed to object to Assistant District Attorney Cherkasky's allegedly improper bolstering of Robinson's identification of Kirby. (Am. Pet. at 133–39). It is true that the assistant district attorney stated during summation that Robinson identified Kirby twenty minutes after the shooting took place. (Tr. at 792). There was nothing inappropriate about this comment. Moreover, even assuming it was problematic, counsel might have chosen not to object to it to avoid calling further attention to it. Finally, even if Kirby could demonstrate that counsel's failure to object to the alleged bolstering fell below an objective standard of reasonableness, he has not demonstrated that the failure to object affected the outcome of the trial. Given

the weight of the inculpatory evidence, this alleged omission could not have had any significant impact on the jury's verdict. Therefore, this claim also fails.

■ In his fourth category of claims, Kirby asserts that his trial counsel failed to present comprehensive legal arguments against the admission of evidence, including a photograph of Kirby and Franklin and the telephone statements made by Kirby while he was in custody. These claims also lack merit. Kirby's counsel objected to the introduction of the photograph, joined in Franklin's counsel's offer to sign a stipulation regarding the admission of the photograph, and even moved for a mistrial when Justice Altman decided to admit it without the stipulation. (Tr. at 438–45). In addition, prior to the fourth trial, Kirby's counsel made a motion for reargument of the original suppression ruling admitting the January 16th statements. These efforts demonstrate that Kirby's counsel vigorously opposed the admission of the aforementioned evidence. Furthermore, Kirby has not demonstrated the requisite prejudice necessary to succeed on a *Strickland* claim. Accordingly, these claims also fail.

■ In his fifth category of claims, Kirby argues that his trial counsel improperly revealed a belief in his lack of Kirby's innocence when he stated in his summation, "I trust when you enter the jury room and deliberate upon the evidence that you saw and heard, yours will be a verdict in keeping with justice, whatever the verdict may be." (Tr. at 661–62). This allegation also fails to meet the standard set out in *Strickland.* There was nothing inappropriate about this comment, particularly when it is considered in the context of the entire summation. Counsel argued vigorously for Kirby's acquittal. He emphasized that Lee Williams could not identify Kirby as one of the shooters.

(*Id.* at 679, 698). He challenged the State's theory that Houze's death motivated the shootings of Robinson and Burwell a year and a half later. (*Id.* at 667, 682). Most importantly, he vehemently attacked the credibility of Magnuson, Robinson, and Richardson, the prosecution's three most important witnesses. (*Id.* at 670–77, 682–87, 689–99). It is not at all improper for a defense attorney to remind jurors of their duty to deliver a verdict consistent with the evidence, when counsel has just finished attacking the evidence.

■ In his final category of ineffective assistance claims, Kirby argues that his trial counsel presented implausible alternative theories of the crime, including a theory that there was another shooter on the other side of the road and a theory "concerning a machine gun." (Am. Pet. at 181). These theories, Kirby contends, "insult[ed] the jury's intelligence" and were "perceived by the jury as utter idiocy." *Id.* These claims also lack merit, for, again, these are matters of defense counsel's trial strategy. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Given the evidence presented by the prosecution (including an eyewitness identification), trial counsel quite understandably sought to present alternate theories of the case that could potentially exonerate his client. Furthermore, what may have seemed implausible to Kirby may have seemed plausible to his counsel at that time. In any event, the introduction of these theories does not meet the *Strickland* standard of an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See id.*

In sum, I find that all of Kirby's ineffective assistance claims lack merit. His application for relief on the basis of these claims is denied.

### D. *Double Jeopardy*

Kirby's next claim is that, in subjecting him to four trials, the State violated the Fifth Amendment prohibition against double jeopardy.

#### 1. *Exhaustion*

Because Kirby raised the double jeopardy issue in his supplemental brief to the New York Court of Appeals, he has exhausted the claim and I may reach its merits.

#### 2. *The Merits*

■■■■ In *United States v. Perez*, 9 Wheat. 579, 22 U.S. 579, 580, 6 L.Ed. 165 (1824), the Supreme Court held that the double jeopardy clause is not violated when the state retries a defendant after a mistrial is declared out of "manifest necessity." "A jury's declaration that it cannot arrive at a verdict is the 'prototypical example' of a situation in which the declaration of a mistrial becomes a manifest necessity." *Hymes v. Leonardo*, No. 96 Civ. 2207(BSJ), 1999 WL 314184, at *1, 1999 U.S. Dist. LEXIS 7342, at *5 (S.D.N.Y. May 13, 1999); *see also United States v. Chestaro*, 197 F.3d 600, 610 (2d Cir.1999), *cert. denied*, 530 U.S. 1245, 120 S.Ct. 2694, 147 L.Ed.2d 965 (2000). In the instant case, Kirby consented to each of the three mistrials, which were declared when three separate juries were unable to reach unanimous verdicts. *See Kirby*, 112 Misc.2d at 906–07, 447 N.Y.S.2d 606. Neither side disagrees that the juries were genuinely deadlocked. Under these circumstances, it certainly was not an abuse of discretion for any of the trial judges to have declared the mistrials. Because the mistrials were all declared out of "manifest necessity"— and with the consent of Kirby—retrial did not violate the double jeopardy clause. Accordingly, this claim fails.

### E. *Prosecutorial Misconduct*

Kirby's final claim is that ADA Cherkasky committed perjury when he stated in his summation, "There is no evidence in this case of any deal between the DA's office and Mr. Robinson for his testimony" and that this alleged prosecutorial misconduct resulted in a violation of Kirby's Fourteenth Amendment right to due process. (Am. Pet. at 100–01; Tr. at 771).

#### 1. *Procedural Default*

■■■■ A review of the record demonstrates that Kirby did not raise the prosecutorial misconduct claim to the Appellate Division or the Court of Appeals.[12] Because the claim may not be brought in a collateral proceeding, and Kirby has not demonstrated either cause and prejudice or that failure to consider the claim would result in a fundamental miscarriage of justice, this claim is defaulted.

#### 2. *The Merits*

■■■■ Even if the claim was not barred, however, it is without merit. First, it is unclear what, if any, "deal" the District Attorney's Office had with Robinson. After summations at the fourth trial, counsel for Franklin argued that testimony in earlier trials showed there was a "detailed

**12.** Fox's submission to the Court of Appeals solely addressed the admission of the January 16th statements and the Appellate Division's denial of Kirby's request to file a pro se supplemental brief. (Fox Letter at 4). Although Kirby's submission to the Court of Appeals lists "prosecutorial misconduct" as a claim, it does not refer to the summation comment. (Kirby Letter at 2). Rather, the letter characterizes the claim only as "[p]rosecutorial misconduct due to the arbitrary, capricious and deliberate discretionary abuse of the power of the badge by the District Attorney." (*Id.*). This cursory language did not fairly present the instant claim to the Court of Appeals, and the claim is thus unexhausted.

and specific plea bargain" between Robinson and the District Attorney's Office whereby Robinson agreed to plead guilty to reduced charges, with sentences to run concurrently rather than consecutively, and the District Attorney's Office promised in return to write a letter to the Parole Board recommending the earliest possible release. (Tr. at 809, 811–12). Cherkasky denied that such a deal existed, and asserted that the District Attorney's Office only agreed not to use Robinson's testimony about prior bad acts against him and to let the sentencing judge know about his testimony.[13] (*Id.* at 809–10, 813–14). Although some discrepancy exists as to the nature of the agreement, I will assume for purposes of this petition that the District Attorney's Office did have an understanding with Robinson with regard to his testimony in Kirby's case.

Given the evidence presented to the jury, however, the prosecutor's statement was not incorrect. No evidence of a "deal" was presented at the fourth trial because the defense counsel did not want it to be introduced. (*Id.* at 362–79). During Robinson's testimony, ADA Cherkasky sought to introduce prior consistent statements Robinson made shortly after the shooting to rebut a charge of recent fabrication. (*Id.* at 361). Defense counsel for Franklin and Kirby opposed the admission, arguing that neither defendant had alleged that Robinson had recently fabricated his story in exchange for favorable treatment by the District Attorney's Office. (*Id.* at 363–65, 370). As part of their strategy, both counsel chose to forego the possible "recent fabrication" argument to prevent the State from introducing Robinson's potentially damaging prior consistent statements. Instead they chose to discredit Robinson's testimony on the whole as unreliable. (*Id.* at 370). Specific evidence of a prior deal was thus never introduced,[14] and Justice Altman ultimately precluded the admission of the prior consistent statements.[15] (Id. at 373, 375).

Although the prosecution may have had an agreement with Robinson, no evidence of any deal was presented to the jury and thus Cherkasky's statement was not incorrect. Even Franklin's counsel acknowledged that "what Mr. Cherkasky said in the narrowest sense is technically correct[; t]here is no evidence in this particular trial of a deal this particular jury heard." (*Id.* at 809). The assistant district attorney may have needlessly caused a ruckus by raising the issue during summation, but the statement was in fact true. Moreover, during the jury charge, the court cured any possible prejudice by calling the jury's attention to the sentence Robinson received. (*Id.* at 843). This final claim is rejected.

13. Cherkasky further asserted that Robinson was permitted to plead guilty to reduced charges because the assistant district attorney believed his claim of self-defense. (Tr. at 812–13).

14. Evidence had been adduced, however, that Robinson received a combined sentence of six years to life for various crimes (including the murder of Houze). (Tr. at 367). The prosecution argued that this amounted to a charge of recent fabrication, but the judge ultimately precluded Robinson's prior consistent statements.

The only other mention of a "deal" came during jury deliberations, when Kirby yelled out after a read-back of testimony, "People of the jury, we're innocent, they are lying to you, it was a deal made between Robinson and Miss Ryan and Detective Roberts." (Tr. at 897).

15. When Franklin's counsel renewed his objection after summation, Justice Altman decided to charge the jury that, in assessing Robinson's credibility, they could take into account the sentences he received for his prior felonies. (Tr. at 818–19).

## CONCLUSION

For the foregoing reasons, petitioner's petition for a writ of habeas corpus is denied. Because the petitioner has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253 (as amended by the AEDPA). I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.